UNITED STATES of America,
Plaintiff-Appellee,

v.

**William O'Neal RHODES and Jack Dempsey Waites,
Defendants-Appellants.**

No. 77-5120.

United States Court of Appeals,
Fifth Circuit.

March 13, 1978.

Rehearing and Rehearing En Banc
Denied April 13, 1978.

William E. Skinner, Montgomery, Ala., (Court-appointed), for Rhodes.

Randolph P. Reaves, Montgomery, Ala., (Court-appointed), for Waites.

Barry E. Teague, U. S. Atty., D. Broward Segrest, Charles R. Niven, Asst. U. S. Attys., Montgomery, Ala., for plaintiff-appellee.

Before GODBOLD, HILL, and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Appellants Jack Dempsey Waites and William O'Neal Rhodes appeal from the jury verdict and judgment finding each of them guilty of violating 18 U.S.C. § 2113(d). We affirm.

On March 8, 1976, the Chilton County Bank in Thorsby, Alabama, a bank insured by the Federal Deposit Insurance Corporation, was robbed of a sum in excess of $15,000.

On that day, three armed men, each wearing green jump suits and clear plastic masks with "silly grin-like expressions painted on them," entered the bank. One man carried a handgun described as a nickel or chrome plated, large caliber automatic, with etchings on it, a gold trigger and a pearl handle. This weapon was later found in the car of Defendant Rhodes' wife. The robber carrying the distinctive handgun was later identified as Robert Case.

The second robber, armed with a carbine, stood just inside the door of the bank while the money was being collected. In removing the currency from the cash drawer, the surveillance cameras were activated.

The third robber went around the other end of the teller's line where he approached Sarah Benson who told the robber where the money was located. Mrs. Benson later identified defendants Rhodes and Waites as two of the persons who robbed the bank.

Shortly, thereafter, the three men fled the scene in a red 1969 Mustang which had been stolen that afternoon.

Jerry Smith observed the robbers' exit from the bank, followed the Mustang, took down the tag number and gave it to the police. When the car was found, it was processed for fingerprints. One of the fingerprint lifts was identified as the left thumb print of Robert Case.

Robert Case was arrested in Atlanta, Georgia on March 11, 1976. He was found in possession of $1,339 in United States currency. The serial numbers of eight five dollar bills matched the list of bait money taken from the bank. On April 7, 1976, defendant Waites was arrested in Morrow, Georgia in the presence of Deborah Moore. On May 14, 1976, defendant Rhodes was arrested in Smyrna, Georgia in a 1975 Chrysler Cordoba, which an invoice showed was purchased with a fifteen hundred dollar cash deposit on March 9, 1976. In the trunk of the car was found the distinctive handgun referred to previously.

On October 6, 1976, defendants Rhodes, Waites and Robert Case were indicted in a two count indictment charging violations of 18 U.S.C. §§ 2113(a) and 2113(d). On October 29, 1976, a hearing was held on the defendants' motions for severance. The motions were denied.

Trial was set for November 8, 1976, but was continued due to the escape of Case and Waites from custody on November 6, 1976. Waites had been apprehended but Case remained a fugitive. Trial began on February 7, 1977. Defendants Rhodes and Waites were found guilty of Count Two of the indictment on February 9, 1977. Each was sentenced to 20 years custody.

At trial, five eyewitnesses to the robbery testified. These were: Gerald Atkinson, President of the Chilton County Bank; Michael Henry, a bank employee; Sarah Benson, the Vice-President and cashier of the bank; Jerry Smith, and Paul Worthy, observers outside the bank. Of these witnesses, Case was consistently identified as one of the robbers. The witnesses testified that they were, with the exception of Sarah Benson, unable positively to identify defendants Rhodes and Waites as perpetrators. Sarah Benson testified that based on their build, hair, facial structure, side profile, and complexion, Rhodes and Waites were two of the robbers.

Nancy Rodden, an employee of Atlanta Costume Company, testified that on March 2, 1976, she sold three clear plastic masks (like those used to disguise the robbers) to two men who handed her a hundred dollar bill to pay for the $5.95 purchase. She identified one of these men as defendant Waites. FBI agent, Robert T. Parker, testified as to the recovery of the gun from the car of Rhodes' wife and to the invoice found in the car, indicating that a fifteen hundred dollar cash deposit was paid on the car the day following the robbery. Agent Parker also testified that he arrested W. T. Ridings, now deceased, and from Ridings seized two pairs of green jump suits and the clear masks.

Deborah Moore, whom the Court found not to be the common law wife of defendant Waites and therefore competent to testify against him, testified that Waites had introduced her to both Case and Rhodes. She testified that she overheard Waites calling Rhodes on March 7, 1976, concerning a trip and that on March 8, Waites departed and returned that evening with stacks of money which they started spending the next day. She further testified that Waites had brought a suitcase to their trailer which contained dark jump suits, masks, and guns, including a gun with a pearl handle and gold trigger. Mrs. Moore testified that, upon his arrest, Waites instructed her to take the suitcase and its contents to W. T. Ridings.

Testimony was also received from an expert witness, who, by comparison of the bank surveillance film with film taken at the bank of height charts in various locations, was able to testify as to the approximate height of the robbers. Evidence was also received, showing that Case and Waites had escaped from custody pending trial.

After denial of their motions for acquittal, the defendants presented evidence. Defendant Rhodes relied upon the defense of an alibi. His wife, mother-in-law, and two friends of his wife testified that Rhodes was in Atlanta at the relevant times on March 8, 1976.

Rhodes also called Leon Johnson to the stand. He testified that he had met Rhodes in the Atlanta Penitentiary and that actually he, his brother and Case had robbed the bank. He was able to give details of the robbery. He also claimed ownership of the gun with the pearl handle and gold trigger. He testified that he had borrowed Mrs. Rhodes' car and had left the gun in it. Johnson explained that the reason for his coming forward to testify was "to get it over with" because he was serving thirty years for another bank robbery.

On cross-examination, Johnson admitted that he had been convicted the previous week of robbing a bank in South Carolina. At that trial, Rhodes had testified on behalf of Johnson. Furthermore, the testimony of Johnson. Furthermore, the testimony disclosed that Johnson and Rhodes had been transported together from South Carolina to Montgomery, Alabama and a Deputy Marshal testified that they had whispered together during the entire trip.

Defendant Waite's defense consisted in the main of attacking the identification of him by Mrs. Benson.

The case went to the jury who found both defendants guilty as charged in Count Two of the indictment.

### I. Defendant Waites' Appeal

■ In his first enumeration of error, appellant Waites contends that the prosecution failed to disclose *Brady* material, thereby depriving him of a fair trial.

Appellant contends that he was denied a fair trial because the prosecution did not inform him, before trial, that certain eyewitnesses to the robbery were unable to identify him.

These witnesses testified at trial, were cross-examined by appellant, and admitted their inability to make a positive identification of the appellant. The jury was well aware of the lack of positive identification by these witnesses. Defense counsel in closing argument heavily stressed the lack of identification evidence.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution."

Recently, in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court again addressed the *Brady* rule and established principles which guide us in the resolution of the issue at bar.

In *Agurs*, the Court addressed the situation where defense counsel makes a request for "all *Brady* material," "anything exculpatory" or fails to make a request. Stressing the importance of putting the prosecu-

tion on notice of arguably exculpatory evidence, the Court stated that such a request "really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all."

The Court further held that unless non-disclosure deprives the defendant of a fair trial, there is no constitutional violation requiring that the verdict be set aside, and absent a constitutional violation, there is no breach of the prosecutor's constitutional duty to disclose.

In the instant case, defense counsel's request for "all exculpatory material," as held in *Agurs*, amounted to no request at all. Therefore, unless the evidence was "obviously exculpatory" or "clearly supportive of a claim of innocence," the prosecution had no duty to disclose it. We hold that the evidence was not of such a nature. It will be recalled that the perpetrators of the robbery were dressed in loose-fitting coveralls and wore masks which distorted the features of the face.

The eyewitnesses did not state that the defendant was not one of the robbers. Rather, they testified that they could not state whether the defendant was or was not one of the perpetrators. The inference to be drawn from this testimony was of a neutral nature. Thus, in the circumstances of this case, the evidence was not "obviously exculpatory" or "clearly supportive of innocence." There was no duty to disclose to the defendant the inability of certain eyewitnesses to positively identify him. Defendants' enumeration is meritless.

■ In his second enumeration of error, Waites contends that the trial court erred in denying his claim of the marital privilege and, thereby refusing to bar the testimony of his alleged wife, Deborah Moore.

During the trial, the Government announced its intention to call Deborah Moore to the witness stand. Defendant objected and asserted that under the law of Georgia, which recognizes the existence of common-law marriages, he and Ms. Moore were legally married.

The Court thereupon held a hearing out of the presence of the jury to determine whether the privilege applied.

Deborah Moore was called to the stand. She testified in pertinent part as follows:

Q. Did you marry Jack Waites?

A. No, I didn't.

Q. Were you his wife?

A. No, I wasn't. I just lived with him.

Q. Are you his wife today?

A. No, I am not.

Q. Are you living at this time—what is your—are you living at this time with another person?

A. Yes, I am.

Q. Now, when you first met Jack Waites how old were you?

A. Sixteen.

Q. All right. What name was he utilizing? What name was he using?

A. Ray Moore.

Q. What was your—what is your name?

A. My name?

Q. Yes.

A. Deborah Moore.

Q. This is your given name from birth?

A. Yes, it is.

Q. All right. Did you ever claim to anyone other than private conversations with him to be his wife?

A. No, I didn't.

Q. Did you hold yourself out at the banks and stores and to the ministers and general public that you were Jack Waites' wife?

A. No, I didn't.

Q. Did he ever hold you out to be his wife to the general public and to persons other than yourself?

A. No, sir.

On cross-examination, Ms. Moore admitted, that between her and the defendant, she had referred on occasion to the defendant as her "old man" and husband. However, she still insisted that she had just lived with Waites and did not consider herself to be married to him.

For the limited purpose of testifying as to their relationship, defendant Waites took the stand. He testified that he considered himself to be presently married to Ms. Moore. He introduced two books bearing notations by Ms. Moore that referred to him on one occasion as "my darling husband, Jack."

Georgia by statute recognizes the existence of common law marriages. The statute requires that three conditions be met before the relationship is created. These are (1) capacity of the parties to contract; (2) an actual contract to be presently married; and (3) consummation according to law. Ga.Code Ann. § 53–101.

The trial judge, having heard all the evidence, accepted the testimony of Ms. Moore and found that no state of common-law marriage had ever existed between them. While the undisputed evidence showed that the parties had the capacity to marry and had lived together and engaged in sexual relations, the trial judge found no actual contract to be married had been formed. He therefore ruled that the witness was competent to testify and denied the assertion by Waites of the marital privilege.

■ Whether the privilege exists is a question of fact. Unless the finding is clearly erroneous it must stand. We find that the decision of the trial court was supported by the evidence and was not clearly erroneous. *United States v. Boatright*, 446 F.2d 913 (5th Cir. 1972).

Appellant's enumeration of error is meritless.

■ In his final enumeration of error, Waites contends the trial court erred when it refused, upon request, to specially charge the jury upon the issue of identification.

The defendant requested the Court to charge as follows:

The Court charges the jury that the evidence in this case raises the question of whether the defendant was in fact the criminal actor and necessitates your resolving any conflict or uncertainty [sic] in testimony on that issue.

The burden of proof is on the prosecution with reference to every element of the crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime charged.

In *United States v. Banks*, 485 F.2d 545 (5th Cir. 1973) this Court stated that the requested charge is a proper one to give. Today, we must decide whether the failure upon request to so charge the jury requires reversal of Waite's conviction. We hold, under the circumstances of this case, that it does not require reversal, although it would have been the better practice to have given the requested instruction.

■ It is well established that when reviewing a refusal on the part of the trial court to charge a requested instruction, we must consider the jury charge as a whole in light of the evidence presented and the arguments of counsel. *United States v. Fontenot*, 483 F.2d 315 (5th Cir. 1973).

In this case, the crucial issue was whether or not the defendants were indeed the perpetrators of the crime. It will be recalled that Sarah Benson, the bank teller, was the only witness who could positively place the defendants at the scene of the crime. All the other eyewitnesses were unable to testify positively that Rhodes and Waites were two of the disguised bank robbers.

The closing arguments of counsel for all parties focused upon the issue of identification. Government counsel stressed the testimony of Mrs. Benson. Defense counsel

attacked her testimony, stressing the likelihood of a mistaken identification by her and the inability of the other eyewitnesses to identify the defendants.

The Court instructed the jury that it was its duty to determine the credibility of witnesses, and that the Government had the burden of proving each element of the crime against each defendant beyond a reasonable doubt.

We agree with the Ninth Circuit in *United States v. Sambrano*, 505 F.2d 284 (9th Cir. 1974) that implicit within the instructions given was the question of whether or not the defendants were in fact the perpetrators of the crime.

We think it inconceivable that the attention of the jury was not focused on the issue of the perpetrators' identification. We hold that the trial court did not abuse its discretion in refusing to give defendant's requested instruction. *United States v. Sambrano, supra.*

## II.   Defendant Rhodes' Appeal

In his first enumeration of error, appellant Rhodes contends that the trial court erred in failing to grant his motion for severance from the trial of Waites.   Rhodes contends that, by being tried with Waites, he was prejudiced in two respects.

First, Rhodes contends that he was prejudiced when during the trial, Deborah Moore, the girlfriend of Waites, testified that during the period of March 5–7, 1976, she overheard Waites call Rhodes about a trip and that Waites departed early on the morning of March 8 and returned late that evening with a large amount of money.

Secondly, Rhodes contends he was prejudiced when evidence was introduced to show that Waites had escaped from custody while pending trial.

■ In our analysis we start with the well established principle that relief from prejudicial joinder is addressed to the sound discretion of the trial judge. *United States v. Larson*, 526 F.2d 256 (5th Cir. 1976). As we observed in *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), "Motions for sever-

ance under Rule 14 have rarely been granted and the trial court's decision has not been disturbed absent a clear showing of abuse (citations omitted).   .   .   .   To obtain a severance under Rule 14, the movants have the burden of convincing the Court that without such drastic relief they will be unable to obtain a fair trial (citation omitted).   A mere showing of some prejudice has usually been insufficient, for qualitatively it must be the most *compelling* prejudice against which the trial court will be unable to afford protection.   (citations omitted)" 489 F.2d at 65.

■ In this case, we can only conclude that the trial judge wisely used rather than abused his discretion.

Ms. Moore did testify to having overheard Waites discussing a trip with Rhodes and that Waites returned with a large amount of cash on the evening of March 8, 1976.   However, the trial judge carefully instructed the jury not to consider this testimony as having any evidentiary value against defendant Rhodes.   This was sufficient to protect Rhodes from any prejudice.

Likewise, while the Government was allowed to enter evidence of Waites' escape in order to show his intent, the trial judge again carefully instructed the jury to consider the escape as evidence against Waites alone.   We find that these curative instructions adequately protected Rhodes' rights.

Thus, we hold that the trial judge did not abuse his discretion in failing to sever the trial of Waites and Rhodes.   At most, appellant Rhodes has shown that he had a greater chance of being acquitted if he had been tried separately.   Of course, this is not the standard in determining whether to grant or deny severance.   The enumeration of error is meritless.

■ In his second enumeration of error, Rhodes contends that the government's witness, Sarah Benson, a teller at the bank, was erroneously allowed to make an in court identification of him.   The appellant asserts that the trial identification was based on two previous photographic arrays which the witness was shown and that

these photographic arrays were impermissibly suggestive.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

While appellant's brief points out the dangers which may result from suggestive photographic arrays, nowhere has appellant presented any evidence whatsoever to show that the procedures used by the FBI agents in this case were suggestive or created a likelihood of irreparable identification. Indeed, appellant, at the trial, had no objection when the court admitted the witness's identification of the defendant. Nevertheless, we have reviewed the transcript and have found no evidence of undue suggestion or the like. We conclude that no error appears from the identification of the defendant, much less plain error.

■ In his third enumeration, appellant contends that the prosecutor exceeded the limits of proper cross-examination by eliciting from the appellant's wife that they had first met while appellant was an inmate at the Atlanta Penitentiary. Defense counsel made no objection to the admission of the testimony. To reverse the conviction, plain error must be present.

We readily conclude the testimony to be harmless. A review of the transcript reveals that prior to the testimony of Mrs. Rhodes, the appellant had called Leon Johnson to the stand. Johnson testified on direct examination that he had first met the appellant in the Atlanta Penitentiary. In view of this testimony, elicited by the appellant, we perceive of no harm from the testimony that appellant's wife had also met him in prison. Appellant's enumeration is meritless.

■ In his fourth enumeration, Rhodes contends that the court erred in refusing to give his requested charge on alibi.

The defendant requested the following charge:

The Defense has introduced evidence which may tend to show that the Defendant, William O'Neal Rhodes, could not have committed the offenses charged in the indictment because he was at another place at the time the offenses were committed. This is known as an alibi. An alibi is one of the most perfect and conclusive means of establishing innocence, since the Defendant who was not present at the time of an alleged offense could not have committed it. The burden is on the Government to establish beyond a reasonable doubt that one Defendant was present at the scene of the offense at the time it was committed. Consequently, unless you are satisfied beyond a reasonable doubt that the Defendant was present, you must acquit him.

The Court instructed the jury as follows:

One of the defendants in this case in particular, as I understand the defense, is relying upon the defense of alibi. The evidence has tended to establish his contention that he was not present at the time when, and at the place where the alleged crime was committed, if it were committed. Now, if after a consideration of all of the evidence in the case you have—and that includes the alibi, the testimony that he was somewhere else—if after considering all of that evidence, including the alibi, you have a reasonable doubt as to whether or not a defendant was present at the time and place the alleged offense was committed you should acquit him. And you will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence, and no assumption or inference should be gathered by you because a defendant did not present any particular evidence, if he did not—and I don't pass on that.

Rhodes complains that the trial court's charge failed to contain a statement placing

**392**

the burden on the Government to prove the presence of Rhodes at the scene of the crime. We disagree.

A careful reading of the charge given reveals that the charge does place the burden of proof on the Government by stating that the defendant does not have the burden of producing evidence and that if a reasonable doubt exists, the defendant should be acquitted.

Furthermore, we do not determine the correctness of jury charges by analysis of only an isolated fragment of a charge. Rather, we examine the charge as a whole. In this light, a reading of the entire charge reveals that immediately preceding the giving of the portion of the charge complained of, the court charged the jury on the government's burden to prove beyond a reasonable doubt every element of the crimes charged. Clearly, the jury was adequately apprised of the law on the defense of alibi. We find appellant's contention to be meritless.

Finally, Rhodes contends that even if the evidence is viewed in the light most favorable to the government, it is insufficient to support the conviction. Appellant's argument is premised on the contention that Mrs. Benson's identification must be suppressed because of undue suggestion giving rise to a substantial likelihood of irreparable misidentification. We have previously rejected this contention, finding no evidence to support suppression of the identification. Having so held, the evidence was clearly sufficient to support the conviction.

AFFIRMED.