**UNITED STATES of America**

v.

**Robert P. DeLUCA, Sr., Gerard T. Ouimette.**

**Crim. No. 95–029.**

United States District Court,
D. Rhode Island.

Nov. 7, 1996.

James H. Leavey, Assistant U.S. Attorney, United States Attorney's Office, Providence, RI, for plaintiff.

John F. Cicilline, Sara Rapport, Providence, RI, for defendants.

## MEMORANDUM AND ORDER

TORRES, District Judge.

On February 1, 1996, Gerard Ouimette was sentenced to concurrent terms of life impris-onment without parole pursuant to 18 U.S.C. § 3559 (the "Three Strikes Statute") after being found guilty of conspiracy to collect extensions of credit by extortionate means (18 U.S.C. § 894) and collection of extensions of credit by extortionate means (18 U.S.C. § 894). Pursuant to Fed.R.Crim.P. 33, Oui-mette has moved for a new trial based on a claim of newly discovered evidence. Because I find that none of the proffered evidence was "newly discovered"; and, because I fur-ther find that it is insufficient to undermine confidence in the verdict, I have determined that the motion for a new trial should be denied.

### *Factual Background*

At trial, the government presented evi-dence that, early in 1995, Ouimette was in-volved in two incidents of extortion. The first involved efforts to collect a loan alleged-ly made to Paul Calenda and the second involved an attempt to obtain money from David Duxbury.

The evidence regarding the Calenda inci-dent included testimony by Paula Copolla who claims to have overheard a conversation between Ouimette and Calenda in which Oui-mette demanded $125,000 and several re-corded conversations in which Ouimette threatened to commit a variety of violent acts against Calenda. It also included testimony by James Gellerman, an alleged co-conspira-tor who pled guilty on the day of impanel-ment and agreed to cooperate with the gov-ernment.

The evidence regarding the Duxbury inci-dent consisted principally of testimony by Duxbury and Gellerman, both of whom de-scribed an assault by Ouimette, Gellerman and others upon Duxbury that occurred in the basement of the Satin Doll nightclub and a demand by Ouimette that Duxbury pay the sum of $5,000 on the following day.

Gellerman testified that, during a conver-sation at St. Rocco's Club in February of 1995, Ouimette instructed him to "crack" Calenda for the purpose of persuading Calen-da to repay the alleged loan and that Paul Parenteau was present when that conversa-tion took place. Gellerman further testified

that, on the day after Duxbury was assaulted, Gellerman and Ouimette met at Stykee's Restaurant and Ouimette instructed him to go to Duxbury's place of business along with Parenteau and Harold Drew for the purpose of collecting the $5,000 that had been demanded from Duxbury. According to Gellerman, Parenteau and Drew were present during that conversation.

In support of his motion for a new trial, Ouimette has submitted affidavits from Parenteau and Drew stating that Ouimette never made any such statements. In fact, in his affidavit, Parenteau claims that Ouimette specifically told Gellerman to leave Calenda alone because "he'll run to the Feds."

Ouimette also has submitted an affidavit from Heather Fritz, a former dancer at the Satin Doll. Ms. Fritz' affidavit states that she was present in the basement on the night that Duxbury was assaulted and overheard part of the conversation while hiding in a closet in a nearby room. Ms. Fritz states that she heard no mention of anyone owing anyone money nor any reference to the sum of $5,000. She does say that she heard "the number '25'" and the "word 'dollars'" which, according to Ouimette, supports his contention that the fracas with Duxbury was precipitated by efforts Duxbury was making to collect $2,500 from the son of a co-defendant.

## Discussion

### I. The Applicable Legal Standard

■ Ouimette makes a number of arguments regarding the credibility of Copolla and Duxbury, the government's failure to call several witnesses and alleged errors in some of the Court's evidentiary rulings. Those arguments are inapposite because a motion for a new trial on the ground of newly discovered evidence does not provide a forum for rehashing disputes regarding the sufficiency of evidence or alleged errors in the conduct of the trial that should be raised within the seven-day period prescribed by Rule 33 and/or on appeal.

■ A motion for a new trial on the ground of newly discovered evidence focuses on whether, after the trial, the defendant learned of evidence that he reasonably could not have known about at the time of trial and, if so, how that evidence may have affected the outcome. For obvious reasons, the requirements that ordinarily must be satisfied in order to prevail on such a motion are relatively stringent. The general rule is that a defendant who seeks a new trial on the ground of newly discovered evidence must establish that:

1. the evidence in question was unknown or unavailable to the defendant at the time of trial;

2. the failure to learn of the evidence was not attributable to any lack of due diligence on the part of the defendant or his counsel;

3. the evidence is material and not merely cumulative or impeaching; and,

4. the evidence is likely to result in an acquittal upon retrial.

*United States v. Tibolt,* 72 F.3d 965, 971 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *United States v. Natanel,* 938 F.2d 302, 313 (1st Cir.1991), *cert. denied,* 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980).

■ However, the requirements are less stringent when the prosecutor possessed the evidence; had a duty to disclose it and failed to disclose it. *See United States v. Sepulveda,* 15 F.3d 1216, 1220 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). In such cases, a new trial may be warranted when there is a *reasonable probability* that the evidence would have produced a different result. *United States v. Blais,* 98 F.3d 647, 651 (1st Cir. 1996) (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Stated another way, a new trial should be ordered if the newly discovered evidence is sufficient to undermine confidence in the jury's verdict. *Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct.

1555, 1566, 131 L.Ed.2d 490 (1995); *Sepulveda,* 15 F.3d at 1220 (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383).

■ A duty to disclose arises when evidence is exculpatory. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Thus, the government is required to provide exculpatory evidence to a defendant even though it was not requested. *Ouimette v. Moran,* 942 F.2d 1, 10 (1st Cir. 1991) (citing *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)). However, the government is not obliged to disclose evidence or witnesses already known to the defendant. *United States v. Hicks,* 848 F.2d 1, 4 (1st Cir.1988). Nor is the government obliged to turn over its entire file. *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380.

It has been suggested that there may be a further variation in the applicable test when it is alleged that the newly discovered evidence demonstrates that a key government witness testified falsely. In such cases, some courts have implied that a new trial should be ordered if the court is reasonably satisfied that (1) the testimony was deliberately false and (2) without the false testimony a jury *might* have reached a different conclusion. *Larrison v. United States,* 24 F.2d 82, 87 (7th Cir.1928). The First Circuit has acknowledged the possibility that such a standard might be applied but has not definitively adopted it. *See Sepulveda,* 15 F.3d at 1221; *Wright,* 625 F.2d at 1020.

## II. The Parenteau and Drew Affidavits

It is clear that Ouimette knew, long before trial, that Parenteau and Drew were witnesses to what was said between Ouimette and Gellerman at St. Rocco's Club and at Stykee's Restaurant. Gellerman's testimony and the affidavits of Parenteau and Drew establish that the conversation at St. Rocco's took place while Ouimette, Gellerman and Parenteau were having dinner with each other and that all four of them were together in close proximity during the entire meeting at Stykee's.

However, in determining whether the testimony of Parenteau and Drew was available to Ouimette at the time of trial with the exercise of due diligence, it is important to ascertain when Ouimette learned that their testimony would be relevant to his defense. Until that time, Ouimette would have had no reason to seek out Parenteau and Drew as witnesses.

The first indication that Parenteau and Drew were potential witnesses was provided on the day of impanelment when Gellerman pled guilty and agreed to testify for the government. Shortly thereafter, the government supplied defense counsel with an amended bill of particulars identifying Parenteau and Drew as two of the previously unnamed co-conspirators. In his affidavit, trial counsel acknowledges that he recognized that revelation as an indication that Gellerman had disclosed the names of Parenteau and Drew during his debriefing by the government. At that point, it should have been clear that Parenteau and Drew were potential witnesses. In fact, if Parenteau's account of the conversation at St. Rocco's is accurate, it should have been obvious that he might be a particularly important defense witness because he would be able to testify that Ouimette specifically instructed Gellerman to stay away from Calenda.

In any event, any uncertainty about Parenteau's and Drew's significance as potential witnesses was dispelled during Gellerman's direct testimony on Wednesday, October 18. In his affidavit, trial counsel refers to that date as being "a day or two" before the start of the defendant's case but the record shows that the defendant's case did not begin until the following Monday, five days later, and that the trial was recessed for one day following Gellerman's direct testimony in order to afford defense counsel an opportunity to prepare for cross-examination.

In the context of those events, Ouimette has failed to demonstrate that Parenteau and Drew were unavailable at the time of trial. Trial counsel's affidavit states that, after Gellerman's direct testimony, he instructed an investigator to look for Parenteau and Drew

and that the investigator reported that they could not be found. However, the investigator's affidavit makes no mention of any efforts made to locate Parenteau and Drew. Nor is there any indication that Parenteau and/or Drew left town or were otherwise inaccessible during the trial. On the contrary, Parenteau's affidavit states that, shortly before trial, he learned that Gellerman had become a government informant which suggests that Parenteau was nearby when the trial began. Parenteau's affidavit also states that, shortly after the trial, he was approached by the FBI at his apartment thereby establishing that he was here at that time, too. Similarly, Drew's affidavit states that he lives in Providence and contains no indication that he was unavailable at the time of trial.

Equally significant is the fact that Ouimette's counsel never advised the Court that Parenteau and Drew were potential defense witnesses and that he was having any difficulty in locating them. Nor did counsel ever request the Court's assistance in determining whether the government had any information regarding the whereabouts of Parenteau and Drew or in issuing subpoenas for them. *See United States v. Levy–Cordero,* 67 F.3d 1002, 1018 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996); *United States v. Ortiz,* 23 F.3d 21, 27 (1st Cir.1994). Finally, counsel made no request for any additional time in which to locate Parenteau and Drew beyond the five days that elapsed between Gellerman's direct testimony and the start of the defendant's case. *See Ortiz,* 23 F.3d at 27; *Wright,* 625 F.2d at 1019.

■ In short, I find that Ouimette has failed to make the required showing that the proffered evidence from Mr. Parenteau and/or Mr. Drew was either unknown or unavailable to him at the time of trial.

## III. The Fritz Affidavit

Ouimette makes what appear to be two inconsistent arguments in support of his contention that the proffered testimony of Heather Fritz constitutes newly discovered evidence. On the one hand, he suggests that he was unaware of Fritz's significance as a potential witness until after trial. On the other hand, he argues that, several months before trial, he began making diligent efforts to locate her but those efforts were unsuccessful. I find no merit in either argument.

### A. Knowledge

■ Ouimette knew, in June of 1995, what Fritz claimed to have seen and heard in the basement of the Satin Doll on the night of the Duxbury incident because, on June 30, the government provided Ouimette's counsel with a transcript of Fritz' grand jury testimony. Nevertheless, Ouimette contends that it wasn't until after trial, that he learned what Fritz did *not* hear. More specifically, he claims that he was unaware that Fritz allegedly told FBI agents that she did *not* hear the words "five thousand dollars" or phrases similar to "so and so owes me money." Ouimette also suggests that those statements were exculpatory and that the failure to provide them was a violation of the government's obligation under *Brady.*

There are two flaws in that argument. First, the fact that Fritz did not hear the statements in question is apparent from her grand jury testimony. During her appearance before the grand jury Fritz was asked several times and in several ways to relate *everything* that she saw and heard. The following excerpts from the transcripts are illustrative:

Q Yes, tell us what you saw? (Tr. at 10, 1. 15.)

. . . . .

Q Could you hear what was being said? (Tr. at 11, 1. 8.)

. . . . .

Q Tell us what you saw, when you looked through, how many men? (Tr. at 12, 1. 21.)

. . . . .

Q What else did you hear while hiding in the liquor room? (Tr. at 17, 1. 8.)

. . . . .

Q What else did you hear while you were hiding in the liquor room? (Tr. at 17 1. 18.)

. . . . .

Q Did you hear any other conversations? Can you think of any other conversations that you heard, other than what you have told us, while you were in the basement area, any first names, any reference to why this altercation was taking place? (Tr. at 21, 1. 10.)

Fritz' failure to mention any demands for money or any reference to the sum of $5,000 was a clear indication that she did not hear such statements. Consequently, any prior comments she may have made to agents confirming that she didn't hear those statements adds little or nothing to her grand jury testimony.

■ Moreover, the statements Fritz allegedly made to agents were not the type of exculpatory evidence that, if not provided, would warrant a new trial. A witness statement that merely fails to inculpate a defendant is not necessarily exculpatory. *United States v. Zuno–Arce*, 44 F.3d 1420, 1426 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995) (citation omitted). Whether such a statement is exculpatory depends upon the circumstances. One important factor to be considered is the nature of the opportunity that the witness had to fully and clearly observe the events in question. For example, a witness's inability to identify a defendant as the perpetrator of a crime is not exculpatory when the witness was not in a position to state with any degree of certainty whether the defendant was or was not the person who committed the crime. *United States v. Rhodes*, 569 F.2d 384, 388 (5th Cir.), *cert. denied*, 439 U.S. 844, 99 S.Ct. 138, 58 L.Ed.2d 143 (1978). In cases like this one where a witness says that he or she did not hear particular statements, it makes a considerable difference whether, on the one hand, the witness was in a good position to observe the entire event and can testify with some certainty; or, on the other hand, the witness had a limited opportunity to observe and was unlikely to have heard the statement even if it was made. In the former situation, the witness's testimony would be exculpatory but in the latter situation it would not.

■ Fritz' testimony falls into the latter category. By her own admission, she never saw who was involved in the Duxbury incident and, during most of the time, she was in a closet in a nearby room and was unable to hear much of what was said. At times she heard yelling but could not determine what was being said or who was saying it. At other times, she heard references to dollars but couldn't make out the amounts. In short, her opportunity to observe was so limited that her alleged statements to agents cannot be deemed exculpatory.

■ Even if any such statements are characterized as exculpatory, they are insufficient to undermine confidence in the jury's verdict. Duxbury and Gellerman both testified that Ouimette participated in the assault on Duxbury and that Duxbury was told to deliver $5,000 the following day. Because of Fritz' limited opportunity to hear what was said and because her failure to hear the comments in question was apparent from her grand jury testimony, there is no reasonable probability that disclosure of any of the statements she allegedly made to agents would have produced a different result.

■ Even if the *Larrison* standard is utilized, there would be no reason for ordering a new trial. Fritz' alleged statements to agents are insufficient to establish that the testimony of Duxbury and/or Gellerman was deliberately false. The statements do not directly contradict their testimony because Fritz was in no position to hear the entire conversation. Her statements establish only that, during the portion of the conversation that was audible to her, she did not hear the discussion described by Duxbury and Gellerman.

## B. Unavailability

■ Ouimette's alternative argument is that Fritz was unavailable at the time of trial because she could not be located despite the exercise of due diligence. In support of that argument, Ouimette tenders an affidavit from an investigator who describes the unsuccessful efforts he made to locate Fritz. However, it should be noted that those efforts were not made until mid-August, approximately two and one half months after Fritz' grand jury testimony had been provided and nearly three months before the trial began. It also should be noted that although Fritz' affidavit states that she considered leaving town shortly after her appearance before the grand jury and eventually "decided" to go to Baltimore, she does not say when she actually left town.

Even more significant is the fact that defense counsel never indicated to the Court that Fritz was a potential witness and that efforts to locate her had been unavailing. Nor was the Court asked to determine whether the government had any information with respect to Fritz' whereabouts or to issue a subpoena for her. *See Levy–Cordero,* 67 F.3d at 1018; *Ortiz,* 23 F.3d at 27. Accordingly, I find that the defendant has failed to demonstrate that Fritz was unavailable at the time of trial despite the exercise of due diligence.

### *Conclusion*

For all of the foregoing reasons, the defendant's motion for a new trial is denied.