UNITED STATES of America, Appellee,

v.

Robert P. DeLUCA, Sr., Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Gerard T. OUIMETTE, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Gerard T. OUIMETTE, Defendant, Appellant.

Nos. 96–1173, 96–1221 and 96–2231.

United States Court of Appeals, First Circuit.

Heard May 5, 1997

Decided Feb. 27, 1998.

Rehearings and Suggestions for Rehearings En Banc Denied April 14, 1998.

John W. Mitchell, Concord, NH, with whom Andrew J. Weinstein, New York City, Law Offices of Anthony M. Cardinale, Boston, MA, and LaRossa, Mitchell & Ross, New York City, were on brief, for appellant DeLuca.

Sara Rapport, Boston, MA, for appellant Ouimette.

Margaret E. Curran, Assistant United States Attorney, with whom Sheldon Whitehouse, United States Attorney, Kenneth P. Madden and James H. Leavey, Assistant United States Attorneys, Providence, RI, were on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

CYR, Senior Circuit Judge.

Defendants Robert P. DeLuca, Sr. ("DeLuca Sr.") and Gerard T. Ouimette appeal their respective convictions for conspiring to use extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894, and for aiding and abetting the use of extortionate means to collect extensions of credit, in violation of 18 U.S.C. §§ 2, 894. Their principal claim asserts a violation of the Sixth Amendment right to a public trial, *see Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), relating to the spectator screening procedure implemented *sua sponte* by the United States Marshals Service and ratified by the district court. We affirm the district court judgments.

## I

### BACKGROUND

At issue below were alleged extortion schemes directed against Paul Calenda, a Rhode Island factory and restaurant owner ("Calenda extortion"), and David Duxbury ("Duxbury extortion"). We relate the background facts in the light most favorable to the verdicts. *See Stewart v. Coalter*, 48 F.3d 610, 611 (1st Cir.1995).

#### A. *The Calenda Extortion Scheme*

The Calenda extortion was triggered by the March 1994 murder of Ronald Coppola, a close friend and loansharking partner of appellant DeLuca Sr. Coppola had disclosed to DeLuca Sr. that he had advanced $125,000 to a friend and business associate, Paul Calenda. After the Coppola murder, DeLuca Sr. decided to collect the debt himself but was unable to arrange a meeting with Calenda. Eventually, DeLuca Sr. told Coppola's widow, Paula, that he intended to give Calenda a "whack" in retribution for not meeting with him. At about the same time, DeLuca Sr. discussed Calenda with appellant Gerard Ouimette, who in turn informed another Coppola acquaintance, James "Slugger" Gellerman.

In January 1995 Ouimette told Paula Coppola that he would "break [Calenda's] ... legs" if he failed to repay the $125,000 he owed Coppola. When Calenda denied owing either Coppola or DeLuca Sr., Ouimette and Gellerman visited Calenda at his factory in an effort to collect the Coppola debt. Subsequently, Ouimette confronted Paula Coppola at her home, where he told her boyfriend, Robert Buehne, to summon Calenda by phone. When Calenda arrived at the Coppola residence Ouimette informed him that a power struggle had developed following Ronald Coppola's death, which Ouimette intended to win, and that Calenda could either pay the $125,000, give Ouimette the restaurant Calenda owned, or risk being blown up in his car.

Sometime around February 20, Ouimette and Gellerman appeared at the Calenda factory and announced that Ouimette intended to take over the Calenda restaurant. A few days later Ouimette met with Joe DeLuca, brother of appellant DeLuca Sr., to discuss the Calenda problem. Following their meeting, Ouimette told Gellerman that he wanted Calenda placed in sufficient fear to cause him to go to Joe DeLuca for help. A few days later Ouimette instructed Gellerman to give Calenda a "smack" and collect $50,000 rather than the $125,000 demanded earlier. Ouimette told another underling, Paul Parenteau, to accompany Gellerman.

On February 27 Gellerman and Parenteau met with Calenda at the Calenda factory. The meeting began with a handshake from

Gellerman, accompanied by a sudden, violent blow to Calenda's head. Following the formal introduction, Gellerman instructed Calenda to have the $50,000 ready by the next day. Throughout the encounter, Parenteau remained by the door to prevent anyone from entering or leaving. When Gellerman reported back to Ouimette he was told to stay away from Calenda and not go back to the factory.

About the same time, Paula Coppola, Buehne and Calenda decided to cooperate in a joint investigation by the United States Drug Enforcement Administration (DEA) and the Providence Police Department; of Ouimette and DeLuca Sr. On March 6, during a telephone conversation recorded by the DEA, Buehne told Ouimette that Calenda had something for him and wanted to get together. After voicing concern as to whether Calenda was "on the level," Ouimette agreed to the meeting, adding that DeLuca Sr., not Ouimette, had sent Gellerman to the factory to collect the debt and that Gellerman's "impetuous" assault on Calenda had not been authorized by Ouimette. Ouimette also stated that he was going to warn Gellerman to stop using force because he wanted no part of "shakedowns [which] ... went out with the roaring twenties."

Later that afternoon Ouimette and Calenda met at Calenda's condominium. During their surreptitiously videotaped meeting Ouimette repeated the substance of his earlier conversation with Buehne and reassured Calenda that it had been DeLuca Sr. who sent Gellerman to the factory to collect from Calenda. When Calenda asked how much he would have to pay, Ouimette told him that he and DeLuca Sr. would accept $50,000 even though Calenda owed $125,000. Ouimette then agreed to accept $5,000 per week and Calenda paid him the first installment. Ouimette explained that future installments were to be paid to Buehne, who would deliver them to Ouimette.

At that point Calenda protested that he owed Coppola nothing. Ouimette responded that he knew only what he had been told, then launched into a graphic description of Gellerman's earlier assault against David Duxbury. *See infra* Section I.B. After assur-

ing Calenda that he planned to impress upon Gellerman the need to refrain from using force in the future, Ouimette urged Calenda to call if anyone bothered him or there was anything Ouimette could do to help. Following the meeting with Calenda, Ouimette met Gellerman and told him that Buehne would be receiving $5,000 a week from Calenda, out of which Gellerman would get $1,000 weekly. Ouimette then handed Gellerman $1,000 and remarked: "Pauly's [*i.e.*, Calenda's] paying."

On March 11, Ouimette joined Buehne and Paula Coppola at a Providence restaurant, where Buehne was to deliver a $5,000 installment from Calenda. Their conversation was recorded by the DEA, at whose instruction Buehne tendered Ouimette only $1,500 on the pretext that that was all Calenda had given him. Angered, Ouimette told Buehne that Calenda would be in danger unless he came up with the $3,500 balance by the following Monday. Adding that "maybe [by] Tuesday he's going to get a shot," Ouimette also threatened to break the legs of Calenda's longtime friend and housekeeper. Ouimette cautioned that he was unable to control Gellerman, then recounted an abbreviated version of Gellerman's role in the Duxbury assault.

The next day the DEA and Providence Police assumed protective responsibility for Paula Coppola and Buehne, who ultimately entered into a witness protection program. Later, in several recorded conversations with Buehne, Ouimette indicated his continuing intention to collect from Calenda, stating that he would threaten violence to coerce payment.

Finally, an FBI search of the Ouimette residence on March 18 in Fall River, Massachusetts, disclosed currency bearing the recorded serial numbers of bills included in the $5,000 installment Calenda paid Ouimette on March 6 and the $1,500 partial installment Buehne delivered to Ouimette on March 11.

## B. *The Duxbury Extortion Scheme*

On March 1, 1995, as Ouimette and Gellerman were having a drink with codefendant Kenneth Raposa, Ouimette informed them that Robert DeLuca, Jr. ("DeLuca Jr.") had

"a little problem"; someone was trying to "shake him down" for $2,500. Thereafter, Ouimette, Gellerman and Raposa went to the Satin Doll, a Providence nightclub, to confront David Duxbury who was suspected of the attempted "shake down."

At the Satin Doll they escorted Duxbury to the basement, where Ouimette demanded to know why Duxbury was trying to extort money from DeLuca Jr. After Duxbury told Gellerman that "it was a joke," Gellerman punched him in the face, causing his nose to bleed profusely. Thereupon, Ouimette grabbed Duxbury, slapped him across the face, told him to show DeLuca Jr. some respect, then informed him that he would have to pay a $5,000 "fine" by the next day for attempting to extort money from DeLuca Jr. As Duxbury wiped the blood from his face, Raposa kicked him twice and reminded him to bring the $5,000 "fine" payment the next day. The Satin Doll incident, lasting about ten minutes, was witnessed in part by three Satin Doll dancers.

Following the assault, Duxbury contacted the FBI and volunteered to cooperate in its investigation of DeLuca Sr. and Ouimette. On March 2 Ouimette instructed Gellerman to collect the $5,000 "fine" from Duxbury. Upon learning that Duxbury was not at work, however, Gellerman told Parenteau to advise Duxbury that the $5,000 "fine" would be collected shortly.

### C. The Trial Court Proceedings

A federal grand jury returned a five-count indictment charging Ouimette, DeLuca Sr., Gellerman, DeLuca Jr., and Raposa with con-

spiracy to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and with aiding and abetting the collection of extensions of credit by extortionate means, in violation of 18 U.S.C. §§ 2 and 894.[1] The government promptly filed informations aimed at establishing the predicate convictions to enable enhanced penalties against Ouimette, Gellerman and DeLuca Sr., including mandatory life-imprisonment terms pursuant to the so-called "three strikes" provision, see id. § 3559(c).

One week prior to trial the district court granted a government motion to empanel and partially sequester an anonymous jury. The court specifically relied upon its concern that ties between DeLuca Sr. and organized crime could lead to efforts to influence the jury. Appellants' motions to sever their trials were denied as well.[2]

On the second day of trial, appellants complained to the district court that deputy marshals were screening and recording the identification of all would-be trial spectators near the entrance to the courtroom. Appellants requested an evidentiary hearing to determine whether the unauthorized screening procedure amounted to a "closure" in violation of their Sixth Amendment right to a public trial. Adverting to the same security concerns which had prompted its earlier decision to empanel an anonymous jury, the district court denied the request for an evidentiary hearing and ratified the spectator-screening procedure.

Following a seven-day jury trial appellants were convicted on all counts. Ouimette was

---

**1.** Count one charged Ouimette and Gellerman with conspiring to collect extensions of credit from Paul Calenda and David Duxbury from December 12, 1994, to March 18, 1995. Count two charged that DeLuca Sr. conspired with Ouimette and Gellerman to collect extensions of credit from Calenda during the same period. Ouimette and Gellerman were named unindicted conspirators under Count two. Count three charged DeLuca Sr., Ouimette and Gellerman with using extortionate means to collect from Calenda and to punish Calenda for nonpayment of an extension of credit over the same time period. Count four charged DeLuca Jr. and Raposa with conspiring, from March 1 to 18, 1995, with Ouimette and Gellerman, to collect and attempt to collect extensions of credit by extortionate means from David Duxbury. Finally,

Count five charged Ouimette, Gellerman, DeLuca Jr. and Raposa with collecting extensions of credit by extortionate means from Duxbury over the same time period and with punishing Duxbury for nonpayment.

**2.** The court allowed a severance relating to DeLuca Jr. and Raposa. Raposa's conviction has been affirmed in an unpublished opinion. See *United States v. Raposa,* 121 F.3d 695 (1st Cir. 1997) (per curiam). On the eve of appellants' trial, Gellerman pled guilty pursuant to a plea agreement and thereafter cooperated with the government in return for its promise to seek dismissal of the "three strikes" information. *See* 18 U.S.C. § 3559(c).

sentenced to life imprisonment. The sentence imposed upon DeLuca Sr. was limited to 126 months because the government failed to establish the requisite predicate convictions for a "three strikes" enhancement. These appeals followed.[3]

· Noting the important Sixth Amendment concerns generated by the courtroom-spectator screening procedure, we retained appellate jurisdiction and remanded for factual findings relating to its ratification by the district court. In due course the district court conducted an evidentiary hearing and entered detailed findings.

# II

## *DISCUSSION*

### A. *The Anonymous Jury Empanelment*

▮ Appellants first contend that the decision to empanel an anonymous jury constituted an abuse of discretion. *See United States v. Childress,* 58 F.3d 693, 702–03 (D.C.Cir. 1995) (per curiam). We disagree.[4]

▮ Although the empanelment of an anonymous jury should be recognized as an extraordinary protective device, especially if it tends to suggest that the jurors may have something to fear from the accused, thereby conceivably encroaching upon the presumption of innocence, *see United States v. Krout,* 66 F.3d 1420, 1427 (5th Cir.1995), it is a permissible precaution where (1) there are strong grounds for concluding that it is necessary to enable the jury to perform its

factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused. *See United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991).

▮ Our review takes into account not only the evidence available at the time the anonymous empanelment occurred, but all relevant evidence introduced at trial. *See Krout,* 66 F.3d at 1427. We conclude that the record as a whole affords sufficient foundation for empaneling an anonymous jury both as a prudent safety precaution and a means of ensuring unfettered performance of the factfinding function.

First, the record links appellants to organized crime, a factor which strongly indicated that clandestine "outside" assistance might be brought to bear in any effort to intimidate or punish jurors. *See United States v. Ross,* 33 F.3d 1507, 1520 (11th Cir.1994); *cf. United States v. Doe,* 63 F.3d 121, 130 (2d Cir. 1995) ("The problem of retaliation against those producing adverse testimony is especially acute in the context of criminal organizations. . . . Hence, a district court in such a case might attribute the lack of a direct threat to the very confidentiality that the defendant or witness seeks to preserve.").[5] Moreover, Ouimette's capacity and readiness to enlist criminal confederates in jury tampering plans was supported by actual precedent.[6] *See Ross,* 33 F.3d at 1520 (court may consider "defendant's past attempts to interfere with the judicial process"); *United*

---

**3.** Five months after filing a notice of appeal Ouimette moved for a new trial, citing "newly discovered" evidence that he had been falsely implicated by Gellerman. The motion was denied on the ground that the supporting affidavits did not disclose "newly discovered" evidence. *United States v. DeLuca,* 945 F.Supp. 409 (D.R.I. 1996). The Ouimette appeal from the latter order (No. 96–2231) has been consolidated with the appeals relating to the DeLuca Sr. and Ouimette convictions and sentences (Nos. 96–1173 & 96–1221) in the present proceeding. ·

**4.** Although appellants also challenge the partial sequestration ruling, we confine our direct discussion to the anonymous empanelment ruling since both rulings in context implicate essentially similar constitutional concerns (*i.e.,* their potential effects on the presumption of innocence). *See United States v. Edmond,* 52 F.3d 1080, 1092

(D.C.Cir.1995) (noting that jury sequestration, unlike juror anonymity, does "nothing to insulate jurors against retaliatory attacks after the guilty verdict [is] rendered").

**5.** A RICO conspiracy indictment previously filed in *United States v. DeLuca,* Crim. No. 94–10287–MLW (D.Mass.), alleged that DeLuca Sr. belonged to the Patriarca crime family. The recorded conversations introduced at trial below contained statements by Ouimette relating to organized crime organizations based in New York.

**6.** In 1982 the Rhode Island State Police stopped an automobile carrying several convicted felons in possession of a metal pipe, a loaded firearm, and a list identifying the individual jurors empaneled to try Ouimette in a pending criminal case.

*States v. Tutino,* 883 F.2d 1125, 1132–33 (2d Cir.1989).

Second, both Ouimette and DeLuca Sr. have long been involved in violent crimes, including robbery, assault with a dangerous weapon, larceny in a dwelling, and conspiracy to commit murder, not to mention their violent extortions in the instant case. *See United States v. Riggio,* 70 F.3d 336, 339–40 (5th Cir.1995).

Third, appellants also attempted to tamper with witnesses and to suborn perjury in the instant case. DeLuca Sr. and Ouimette, through intermediaries, pressured prospective prosecution witnesses, Paula Coppola and Robert Buehne, to perjure themselves, and offered $5,000 to another prospective government witness, David Duxbury, to abscond prior to trial. Thereafter, when Duxbury nevertheless showed up at a pretrial hearing, Ouimette told an associate: "If we can't get [Duxbury], we'll get one of his kids." *See United States v. Edmond,* 52 F.3d 1080, 1091–92 (D.C.Cir.1995) (noting that a general preparedness to obstruct the judicial process may serve as indirect evidence of readiness to engage in jury tampering as well); *United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995) (same).

Fourth, both Ouimette and DeLuca were confronting *mandatory lifetime sentences* upon conviction, which surely provided a strong inducement to resort to extreme measures in any effort to influence the outcome of their trial. *See Ross,* 33 F.3d at 1520. Moreover, their trial was prominently and extensively covered by local print and electronic media (*e.g.,* several lengthy front-page stories in the Providence Journal), to the degree that any public disclosure of the jurors' identities would have enhanced the practicability, hence the likelihood, of efforts to harass, intimidate, or harm the jurors.[7]

Finally, the district court adopted prudent measures designed to safeguard defendants' constitutional rights by informing the members of the jury that their identities would not be disclosed, so as to ensure that no extrajudicial information could be communicated to them during trial, either by the public or by media representatives. Thus, the court explained, the constitutional right of each defendant to a jury trial, based exclusively on the evidence, would be preserved.

In our view, the district court thereby satisfactorily averted any unacceptable risk of intrusion upon the constitutional rights of the individual defendants by diverting juror attention from the possible perception that anonymous empanelment was a safeguard against defendants' dangerousness. *See United States v. Darden,* 70 F.3d 1507, 1532 (8th Cir.1995); *Ross,* 33 F.3d at 1520; *Paccione,* 949 F.2d at 1192. Accordingly, given the demonstrated need, coupled with the cautionary instruction fashioned by the district court, the anonymous jury empanelment did not constitute an abuse of discretion.

## B. *The Procedural Impediments to Courtroom Access by Spectators*

■ The United States Marshal, acting *sua sponte* on the first day of trial, established a screening and identification procedure whereby each would-be spectator was required to present written identification before being allowed to enter the courtroom. Deputy marshals examined whatever written identification was presented, then recorded the type of identification and the bearer's name, address and birth date. The recorded information was retained by the United States Marshal for use in determining whether the bearer had a criminal background or any connection with a defendant on trial, such as might indicate a courtroom security risk. On the second day of trial the district court ratified the spectator screening procedure over appellants' objections. *See supra* Section I.C.

Appellants contend on appeal that the screening procedure violated their Sixth

---

7. While Ouimette maintains that no single factor warranted the anonymous empanelment, it is the totality of the circumstances which we consider. *See United States v. Darden,* 70 F.3d 1507, 1532 (8th Cir.1995). Likewise unavailing is the plaint that some of the evidence of prior jury and witness tampering efforts was disputed. There is neither authority nor sound reason for requiring that trial court findings in this regard be established beyond a reasonable doubt. *Cf.* 18 U.S.C. § 3432.

Amendment right to a public trial. As their claims have been preserved, *see United States v. Brazel*, 102 F.3d 1120, 1154 (11th Cir.) (Campbell, J.) (finding no waiver in similar circumstances), *cert. denied*, —— U.S. ——, 118 S.Ct. 79, 139 L.Ed.2d 37 (1997), our review is plenary, *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir.1995).

 The Sixth Amendment right to a public trial enures to the benefit of the criminal justice system itself as well as the defendant, by enhancing due process, encouraging witnesses to come forward, and enabling the public at large to confirm that the accused are dealt with fairly and that the trial participants properly perform their respective functions. *See Waller*, 467 U.S. at 46, 104 S.Ct. at 2215; *see also Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir.1992). Due to the important individual rights and public interests at stake, an alleged violation of the Sixth Amendment right to a public trial resulting from a "total" closure is not subject to "harmless error" analysis. *Waller*, 467 U.S. at 49 n. 9, 104 S.Ct. at 2217 n. 9 (stating that a requirement that prejudice be shown "would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury") (citations and internal quotation marks omitted). Nevertheless, the Sixth Amendment right to a public trial is not absolute and must on occasion yield to competing interests in the fair and efficient administration of justice. *Id.* at 45, 104 S.Ct. at 2214–15.

The government initially urges, as a matter of law, that the Sixth Amendment right to a public trial was never implicated in the present case because the challenged screening procedure effected neither a total nor a partial closure. According to the government, a "closure" occurs only if the trial court unconditionally excludes persons from the courtroom, but not if it simply imposes universal preconditions on courtroom access which have the incidental effect of barring only those persons who elect not to comply. To cite an obvious example, magnetometer screenings are designed to prevent armed spectators from entering the courtroom, yet no one would suggest that conditioning spec-

tator access on submission to reasonable security screening procedures for dangerous weapons violates the Sixth Amendment right to a public trial. Furthermore, the government correctly notes, no authority squarely holds that such "universal" preconditions to courtroom access constitute a Sixth Amendment "closure." *Cf. Brazel*, 102 F.3d at 1155 (assuming, *arguendo*, that similar identification procedure amounted to "partial" closure). We need not opt for the broad rule urged by the government, however, since the security screening procedure utilized below amounted at most to a permissible "partial" closure.

Although we have yet to rule on the matter, *cf. Martin v. Bissonette*, 118 F.3d 871, 874 (1st Cir.1997), several other courts of appeals have held that the Sixth Amendment test laid down in *Waller*, 467 U.S. at 48, 104 S.Ct. at 2216, need be less stringent in the "partial" closure context; that is to say, a "substantial reason," rather than an "overriding interest," *see id.*, may warrant a closure which ensures at least some public access. *See Osborne*, 68 F.3d at 98–99; *United States v. Farmer*, 32 F.3d 369, 371–72 (8th Cir.1994); *Woods*, 977 F.2d at 76; *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir.1989); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir.1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir.1984) (per curiam). These courts essentially conclude that a less stringent standard is warranted in the "partial" closure context provided the essential purposes of the "public trial" guarantee are served and the constitutional rights of defendants are adequately protected. *See, e.g., Osborne*, 68 F.3d at 99; *Woods*, 977 F.2d at 76. As yet, no court of appeals has held otherwise.

Unlike the "total" closure in *Waller*, 467 U.S. at 42, 104 S.Ct. at 2213, which excluded *all* persons (other than court personnel, witnesses, parties and trial counsel) throughout the entire suppression hearing, the screening and identification procedure employed below effected at most a "partial" closure, as it (1) barred only those would-be spectators who opted not to submit written identification, and (2) presumably may have "chilled" attendance by some potential spectators who

opted not to present themselves at the courthouse. *Cf. Woods,* 977 F.2d at 74 (finding "partial" closure where members of defendant's family were excluded while particular witness testified). Moreover, the district court supportably found that members of the general public, as well as members of the defendants' families, attended throughout the seven-day trial, *cf. id.* at 76, as did credentialed representatives of the print and electronic media, *see Douglas v. Wainwright,* 714 F.2d 1532, 1541 (11th Cir.1983) (noting that media presence and coverage renders court order one for "partial" closure rather than total, by increasing the likelihood that witnesses with material evidence who are unknown to the parties may learn of perjured testimony through media reports even though they themselves do not attend the trial), *vacated and remanded,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), *reinstated,* 739 F.2d 531 (11th Cir.1984).

■ Relying on the requirement that a closure be "no broader than necessary" to promote the asserted justification, *Waller,* 467 U.S. at 48, 104 S.Ct. at 2216, appellants suggest, alternatively, that (1) the anonymous empanelment and partial sequestration adequately addressed any legitimate security concerns, *see supra* Section II.A, or (2) the court could have resorted to less restrictive security measures, such as installing magnetometers immediately outside the courtroom. In addressing these contentions, we note at the outset that since the spectator-screening procedure resulted at most in a "partial" closure, the government was not required to establish that it furthered a "compelling" interest but simply a "substantial" one. *See, e.g., Osborne,* 68 F.3d at 98–99.

■ Although anonymous empanelment and partial sequestration may afford jurors significant protections beyond the confines of the courtroom, prophylactic procedures of an entirely different nature may be required to safeguard against attempts to intimidate jurors and witnesses in the performance of their courtroom responsibilities.[8] These dif-

ficult judgments are matters of courtroom governance which require "a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings[.]" *Childress,* 58 F.3d at 702. Thus, in our view an appellate court should be hesitant to displace a trial court's judgment call in such circumstances. *See id.* at 705 ("[T]he trial court's choice of courtroom security procedures requires a subtle reading of the immediate atmosphere and a prediction of potential risks—judgments nearly impossible for appellate courts to second-guess after the fact."); *see also United States v. Brooks,* 125 F.3d 484, 502 (7th Cir.1997) ("The decisions of a district court concerning security in the courtroom are reviewed deferentially."); *Elledge v. Dugger,* 823 F.2d 1439, 1456 (11th Cir.1987) ("[W]e generally defer to a trial court's discretion in courtroom-security decisions."); *cf. In re San Juan Star Co.,* 662 F.2d 108, 117 (1st Cir.1981) (noting that appellate court "must defer to the [district] court's ... close familiarity with the nature of the [trial] publicity involved").

As the Eleventh Circuit acknowledged recently in relation to another spectator-screening procedure, given their many coincident duties trial judges cannot be expected to scan their courtrooms efficiently on a continuous basis for spectators whose very demeanor might represent an attempt to intimidate a witness or juror. *See Brazel,* 102 F.3d at 1155 (addressing "fixed stares" directed at witnesses by courtroom spectators). Similarly, in the circumstances presented here we cannot agree that prudent identification procedures suitably focused at deterring would-be trial spectators who may pose unacceptable risks—either to the security of the courtroom or the integrity of the factfinding process—need be held in abeyance pending evidence of an actual attempt to influence or harm a witness or juror in the case on trial. Therefore, though we cannot endorse the unilateral action by the United States Marshal, we hold that it did not strip away the

---

8. Nor, of course, do jury sequestration and anonymous empanelment afford protection or anonymity to prosecution witnesses, several of whom were eyewitnesses to appellants' violent extortion practices and at least two of whom later were placed in a witness protection program.

substantial deference due the district court's subsequent assessment that the screening procedures were warranted.[9]

These appellants either were directly associated with prior efforts to obstruct fair factfinding through untruthful trial testimony, or were found to possess the present means as well as ample inducement (*viz.*, avoidance of potential life sentences) to sponsor similar efforts in the case at bar, *see supra* Section II.A. Moreover, the challenged spectator-screening procedure was reasonably designed to respond to these concerns, as it plainly alerted would-be spectators that their courtroom conduct would be closely monitored, thereby efficiently focusing the desired deterrent effect principally upon those most likely to impede a fair and orderly trial—particularly appellants' criminal associates. Thus, the challenged screening procedure represented a permissible response to defendants' demonstrated capacity and motivation to undermine the administration of justice at their trial.[10]

Finally, as the district court supportably found, their extensive criminal histories (not to mention the violent criminal activity al-leged in the pending indictment) generated realistic concerns that appellants might circumvent normal courtroom security procedures, as by attempting to coerce or bribe authorized personnel to facilitate the introduction of weapons into the courtroom or elsewhere in the courthouse.[11]

In our view, therefore, the district court order ratifying these screening procedures adequately addressed and significantly minimized the demonstrated potential for harassment and intimidation of jurors and witnesses by would-be trial spectators, for many of the same reasons that warranted the anonymous empanelment and partial jury sequestration. *See supra* Section II.A. Although any courtroom closure represents a serious undertaking which ought never be initiated without prior judicial authorization, we conclude that the partial closure in this case did not contravene the Sixth Amendment, given the strong circumstantial and historical evidence that precautionary security measures were well warranted and the essential constitutional guarantees of a public trial were preserved.

9. Appellants also point to the United States Marshal's failure to run criminal background checks before spectators were allowed to enter the courtroom. Leaving aside the practicability of obtaining background checks in such short order, a matter on which the record is silent, screening procedures aimed at minimizing security risks and functional impediments to trial participants ought not be ruled infirm simply because they may not afford optimum protection. Rather, their deterrent value—in discouraging attendance by those most likely to pose a threat to courtroom security or to impede the factfinding function—represents a substantial benefit in its own right. In the same vein, we think it important to note that measures reasonably designed to ensure a trial which is not only public, *but fair*, ought not lightly be discounted in circumstances where the threat to both these constitutional goals stems from the defendants and their associates at large. *Cf. Woods*, 977 F.2d at 76 (partial closure ordered after witness was threatened by member of defendant's family); *United States v. Hernandez*, 608 F.2d 741, 748 (9th Cir.1979) (partial closure ordered after witness and wife received life-threatening calls).

10. The district court noted its concern that the United States Marshal's pretrial statement to the Providence Journal—that the spectator-screening procedure was for "intelligence" purposes— might have "chilled" public attendance. Appellants suggest that readers may have understood that the data gathered through the screening procedure would be used for investigative purposes by other law enforcement agencies.

Although we are not unsympathetic to these concerns, the United States Marshal's spontaneous remark to the press did not significantly alter the required Sixth Amendment calculus, for at least three reasons. First, though susceptible to overbroad interpretation, the remark was accurate. The information was retained by the Marshal's Service for "intelligence" purposes; that is, to monitor any courtroom spectators whose identities suggested a risk of juror and witness intimidation efforts. Second, the large numbers of spectators in attendance at the trial each day belies any deterrent effect of constitutional dimension from the "Big Brother" syndrome suggested by appellants. Third, the district court found that the information gathered was not made available to other law enforcement agencies.

11. The district court specifically found that the courthouse entrances utilized by employees were not equipped with magnetometers and that authorized personnel could enter the courthouse after hours and on weekends without risking detection. Moreover, there was no magnetometer screening device at the courtroom entrance.

### C. *The Motion to Sever* [12]

DeLuca Sr. contends that the government violated Criminal Rule 8(b) by joining Counts two and three with Counts one, four and five. *See United States v. Natanel,* 938 F.2d 302, 306 (1st Cir.1991) ("The remedy for misjoinder [under Rule 8(b) ] is severance."). Rule 8(b) permits multiple defendants to be joined in a single indictment "if they are alleged to have *participated in* the same act or transaction or in the *same series of acts* or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b) (emphasis added). DeLuca correctly points out that he was not named as a defendant or coconspirator in Count one, *see supra* note 1, the conspiracy count embracing both the Calenda and Duxbury extortions.

Normally, the government may join multiple defendants in a single indictment provided that at least one count alleges a conspiracy or a continuing criminal enterprise ("CCE") and the indictment separately alleges that the appellant committed a substantive offense [*viz.,* the use of extortionate means by DeLuca Sr. to collect from Calenda] during the course and in furtherance of the "umbrella" conspiracy or CCE. *See id.* at 307; *see also United States v. Rehal,* 940 F.2d 1, 3 (1st Cir.1991) (noting that "[a] conspiracy count can be a sufficient connecting link between . . . multiple offenses that tips the balance in favor of joinder") (quoting *United States v. Arruda,* 715 F.2d 671, 678 (1st Cir.1983)); *United States v. Luna,* 585 F.2d 1, 4 (1st Cir.1978). For Rule 8(b) purposes in the present context, therefore, the "participation" requirement did not necessitate an allegation that DeLuca Sr. was a coconspirator under Count one, nor that he knew that Gellerman and Ouimette tried to extort money from Duxbury. *Id.* (noting that defendant's substantive act need not be listed as a predicate for CCE count to warrant joinder). Accordingly, the district court supportably denied the Rule 8(b) motion.

In a related claim, *see* Fed. R.Crim.P. 14, DeLuca Sr. argues that he was severely prejudiced by the joint trial. Specifically, he claims, the district court abused its discretion by denying the motion for severance because Ouimette's ominous statements to Paul Calenda—describing Gellerman's violent assault on Duxbury—so inflamed the jury that it convicted DeLuca Sr. for the less violent Calenda assault merely because he associated with the brutal likes of Ouimette and Gellerman.

We review the challenged ruling only for manifest abuse of discretion, *Natanel,* 938 F.2d at 308, mindful that "[t]he federal courts have long recognized that consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants." *United States v. Josleyn,* 99 F.3d 1182, 1188 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). Thus, DeLuca Sr. was required to make a "strong showing of prejudice." *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992). No abuse of discretion has been made to appear.

First, a measure of evidentiary spillover is a foreseeable concomitant of virtually every joint trial, yet seldom indicates undue prejudice. *United States v. Yefsky,* 994 F.2d 885, 896 (1st Cir.1993). Second, since any evidentiary spillover is vitiated where the evidence in all events would have been admissible against the movant, "[i]n the context of conspiracy, severance will rarely, if ever, be required." *United States v. Flores–Rivera,* 56 F.3d 319, 325 (1st Cir. 1995) (internal quotation marks and citations omitted); *see* Fed.R.Evid. 801(d)(2) (defining, as admissible non-hearsay, statements by defendant's coconspirator during course and in furtherance of conspiracy). So it is here. Ouimette's vivid descriptions of the Duxbury assault clearly facilitated the extortion by inviting Calenda to conclude that he might

---

**12.** We review the denial of a Rule 8(b) misjoinder motion *de novo, United States v. Edgar,* 82 F.3d 499, 503 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996), in light of the facts "responsibly alleged" in the indictment, rather than those established at trial. *United States v. Morrow,* 39 F.3d 1228, 1237 (1st Cir.1994). The party asserting misjoinder bears the burden of persuasion. *United States v. Natanel,* 938 F.2d 302, 306 (1st Cir.1991).

experience similar treatment unless he met the extortionate demands made by Ouimette.

Finally, the district court took prudent precautions against prejudicial spillover by repeatedly instructing the jury that it must consider the evidence against each individual defendant in relation to each count. *See Natanel*, 938 F.2d at 308 (noting that such instructions mitigate risk of spillover).

### D. The Jury Instructions [13]

#### 1. The "Guilt or Innocence" Instruction

█ Appellants challenge the district court instruction that the jury was to determine their "guilt or innocence." We have cautioned that the term "innocence" may tend to undercut the presumption of innocence, as the jury might be prompted to convict where the evidence, though inadequate to prove guilt beyond a reasonable doubt, nonetheless indicated that the defendant may not have been "innocent." *See United States v. Andujar*, 49 F.3d 16, 24 (1st Cir.1995) (finding comparable instruction inappropriate, but not "plain error"); *United States v. Mendoza–Acevedo*, 950 F.2d 1, 4–5 (1st Cir.1991) (same).[14]

█ Duly preserved jury-instruction challenges are reviewed for abuse of discretion, *United States v. Mitchell*, 85 F.3d 800, 809 (1st Cir.1996), to determine "whether the instructions adequately explained the law or 'whether they tended to confuse or mislead the jury on the controlling issues.'" *United States v. Alzanki*, 54 F.3d 994, 1001 (1st Cir.1995) (citations omitted). When the asserted deficiency implicates the government's

burden of proof, we inquire whether there is a "reasonable likelihood" that the jury understood the appropriate standard (*viz.*, proof beyond a reasonable doubt). *United States v. Romero*, 32 F.3d 641, 651 (1st Cir.1994) (citing *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994)). The challenged instruction is not to be assessed in isolation, however, but in light of the entire jury charge. *United States v. DeMasi*, 40 F.3d 1306, 1317 (1st Cir.1994).

As there is no reasonable likelihood that the jury misunderstood the burden of proof the government was required to bear, we find no abuse of discretion. Among the seven references to "guilt or innocence," five occurred in the earliest stages of the jury charge, interspersed with the unobjectionable phrase "guilty or not guilty." Thereafter, the court explained or used the phrase "beyond a reasonable doubt" more than a dozen times,[15] emphasizing that "a defendant is *presumed to be innocent* unless and until the government proves the defendant guilty to your satisfaction beyond a reasonable doubt." *Cf., e.g., Mendoza–Acevedo*, 950 F.2d at 4 (noting that use of "guilt or innocence" may be mitigated by "careful and clear discussion of the presumption of innocence and the government's burden of proof" elsewhere in charge). Although the misleading antithesis "guilt or innocence" certainly should be eschewed, in the context of the entire charge in this case it is highly probable that the jury ultimately understood that the earlier references to the term "innocence" were shorthand for "not guilty beyond a reasonable doubt." *See Romero*, 32 F.3d at 651.

---

**13.** Although Ouimette challenges the "multiple conspiracy" instruction as well, we review only for "plain error" since neither defendant asserted a contemporaneous objection. *United States v. Olano*, 507 U.S. 725, 734–35, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) (holding that, to avoid miscarriage of justice, appellate court has discretion to correct forfeited error, but only if it was obvious under existing law and defendant can show that it prejudiced his "substantial rights" by altering trial outcome). After reviewing the challenged instruction in the context of the entire jury charge, we find nothing approaching plain error.

**14.** The government incorrectly contends that De-Luca Sr. failed to preserve the instant claim.

The parties agreed that an objection by one defendant would serve as an objection by all and Ouimette made a contemporaneous objection.

**15.** As but one example, the court instructed: "And I want to emphasize it[,] in order for the government to prove a defendant guilty of any offense, it's got to convince you beyond a reasonable doubt that it is [sic] proven each and every element beyond a reasonable doubt. Possibilities or even probabilities are not sufficient. If the government fails to prove any one or more of the elements of an offense beyond a reasonable doubt, then you *must find the defendant not guilty* of that particular offense." (Emphasis added.) *Cf. Mendoza–Acevedo*, 950 F.2d at 4 (affirming instruction with same wording).

**38**

### 2. The "Missing Witness" Instruction

 Appellants challenge the refusal to allow their request for a "missing witness" instruction to the effect that the government's failure to call Robert Buehne and Paul Calenda as prosecution witnesses permitted the jury to infer that their testimony would have been unfavorable to the government.

 We review district court rulings relating to "missing witness" instructions for abuse of discretion. *United States v. Lewis,* 40 F.3d 1325, 1336 (1st Cir.1994). First, however, appellants were required to show that Calenda and Buehne were (1) "favorably disposed" to testify for the government by virtue of their status or relationship with the parties, or (2) "peculiarly available" to the government, such as being within the government's "exclusive control." *United States v. Welch,* 15 F.3d 1202, 1214 (1st Cir.1993).

The cooperation rendered the government by Calenda and Buehne during the criminal investigation did not necessarily satisfy appellants' burden of proof. *See United States v. Spinosa,* 982 F.2d 620, 633 (1st Cir.1992) (noting that "[t]here is no *per se* rule that [even] paid government informants are presumed to be so clearly favorably disposed to the government that they are not available to criminal defendants"). More to the point, Calenda invoked his Fifth Amendment right not to testify, thereby rendering himself "unavailable" to either side. *See United States v. St. Michael's Credit Union,* 880 F.2d 579, 598 (1st Cir.1989). Furthermore, it is probable that the testimony Buehne may have been able to provide would have been cumulative of that which his fellow informant and friend, Paula Coppola, offered. *Welch,* 15 F.3d at 1215 n. 7 (1st Cir.1993) (noting that district court need draw no adverse inference against government for not calling a witness when it presents a "plausible explanation," such as the likely cumulativeness of the missing testimony). Finally, and most importantly, appellants made *no attempt* to call either Calenda or Buehne at trial. *Spinosa,* 982 F.2d at 633 (noting that defendant who did not even try to subpoena missing witness was

engaged in after-the-fact "gamesmanship," *i.e.,* attempting to gain the belated benefit of an evidentiary inference adverse to the government without venturing any risk that the missing witness' testimony might have been *unfavorable to the defendant* ). The district court did not abuse its discretion in refusing a "missing witness" instruction.

### 3. The "Missing Evidence" Instruction

 The district court instructed the jury that it was to "focus on the evidence that has been presented and whether, in [its] judgment, that evidence does or does not establish the defendants' guilt beyond a reasonable doubt," and not "wonder[ ] about other things [*viz.,* 'facts that were not presented ... during the course of the trial']." Ouimette contends that the latter instruction improperly suggested that the jury need not concern itself with whether the government proved, beyond a reasonable doubt, the "missing" facts which the defense deemed necessary to support Ouimette's conviction.

Viewed in the context of the entire charge, *DeMasi,* 40 F.3d at 1317, the "missing evidence" instruction did not amount to an abuse of discretion, *Mitchell,* 85 F.3d at 809.[16] Prior to delivering the instruction the court told the jury that its verdicts must be based on "the evidence or the lack of evidence" against each defendant. Moreover, after Ouimette objected, the court gave a supplemental instruction precisely targeting the present claim of error: "I didn't mean to imply [that] you couldn't consider whether the Government has failed to produced (sic) facts that are necessary to establish guilt beyond a reasonable doubt." Nothing more was required.

### E. Sentencing

#### 1. The "Physical Restraint" Enhancement

 DeLuca Sr. challenges the two-level enhancement which the district court predicated on its finding that Calenda had been "physically restrained" by Gellerman at

---

**16.** Furthermore, the instruction set forth a perfectly valid proposition: the jury is not to base its

verdict on speculation, *i.e.,* matters not evidenced at trial.

the Calenda factory. *See* United States Sentencing Guidelines Manual §§ 2E2.1(b)(3)(B); 1B1.1, comment. (n.1(i)).[17] First, DeLuca argues that the enhancement does not apply, since extortion almost invariably involves physical restraint. *Compare United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir. 1991) (vacating analogous § 3A1.3 "physical restraint" enhancement because "[e]very murder involves the ultimate restraint [and] [s]uch terminal restraint is simply an element of the crime of homicide").[18] Section 2E2.1(b)(3)(B) itself belies this contention, however, in that its specific mention of "physical restraint" as an element in determining the offense level for extortions necessarily implies that not every extortion requires resort to physical means or entails a physical restraint of its victim.

◼ DeLuca Sr. further contends that the district court incorrectly decided that the term "physically restrained" encompassed the assault in which Gellerman struck and pushed Calenda, even though Calenda was never "tied, bound, or locked up." U.S.S.G. § 1B1.1, comment. (n.1(i)). The examples listed in the guideline definition of "physically restrained" are merely illustrative, however, not exhaustive. *See id.* ("'Physically restrained' means the forcible restraint of the victim *such as* by being tied, bound, or locked up.") (emphasis added); *see also United States v. Rosario*, 7 F.3d 319, 320–21 (2d Cir.1993). Finally, the district court supportably found that Gellerman pushed Calenda as he attempted to leave the hallway in which he was being assaulted and that Parenteau, throughout the encounter, stood at the hallway door barring egress by Calenda. Thus, these physical restrictions on Calenda's freedom of movement constituted "physical restraint" sufficient to satisfy section 2E2.1(b)(3)(B). *See, e.g., United States v. Jones*, 32 F.3d 1512, 1519 (11th Cir.1994) (per curiam) (confining victims to unlocked room by force is "physical restraint").

### 2. The "Three Strikes" Provision: "Serious Violent Felony"

The "three strikes" provision mandates life imprisonment upon conviction for a "serious violent felony" under federal law following two or more prior convictions for "serious violent felonies" in either federal or state court. A "serious violent felony" includes a federal offense "consisting of ... *extortion*," *id.* § 3559(c)(2)(F) (emphasis added), defined as "an offense that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any *person* or kidnapping of any *person*," *id.* § 3559(c)(2)(C) (emphasis added). On the other hand, the offense of which Ouimette stands convicted defines "extortionate means" to include not only the threatened or actual use of violence against the victim, but the victim's *property* as well. *Id.* § 891(7).

◼ Ouimette contends that collecting extensions of credit by extortionate means, 18 U.S.C. § 894, is not a "serious violent felony" within the contemplation of the so-called "three strikes" provision, *id.* § 3559(c)(1)(A). We review challenged interpretations of sections 3559(c) and 894 *de novo. See United States v. Rasco*, 123 F.3d 222, 226 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 868, 139 L.Ed.2d 765 (1998).

The Supreme Court has held that under the Career Criminals Amendment Act, 18 U.S.C. § 924(e)—an anti-recidivist statute couched in language comparable to 18 U.S.C. § 3559(c), *see Taylor v. United States*, 495 U.S. 575, 600–01, 110 S.Ct. 2143, 2159–60, 109 L.Ed.2d 607 (1990)—the term "burglary" necessitates that the sentencing court determine whether the conduct proscribed by the particular statute of conviction fits the generic (albeit implicit) definition of "burglary" in section 924(e). Where the statute of conviction encompasses some conduct within the

---

**17.** Sentencing guideline interpretations are reviewed *de novo, see United States v. Joyce*, 70 F.3d 679, 681 (1st Cir.1995), while the related factual findings are reviewed for clear error, *United States v. Legarda*, 17 F.3d 496, 499 (1st Cir.1994).

**18.** Since *Mikalajunas* was decided under § 3A1.3, the analogous "physical enhancement" generically applicable to all guideline offenses, we intimate no position regarding its direct holding.

generic definition, but other conduct falls outside the generic definition, the sentencing court may consult the pertinent indictment and jury instructions (if available) to ascertain whether the conviction necessarily was based on conduct falling *within* the generic definition of "burglary" found in section 924(e).

■ The extortion at issue requires no recourse to a record of prior conviction, but simply to the record on appeal. The indictment and jury instructions leave no doubt whatsoever that Ouimette was convicted of violent physical assaults against Calenda and Duxbury, thereby readily meeting the definition of "extortion" in subsection 3559(c)(2)(C) of the "three strikes" provision.[19]

### F. *The Motion for New Trial*

■ Finally, Ouimette challenges the denial of his motion for new trial.[20] The "new" evidence he relied upon consisted of affidavits from Paul Parenteau and Harold Drew, attesting that Ouimette did not order Gellerman to assault Calenda or Duxbury, but instead urged Gellerman to "lay off" Calenda. Thus, these affidavits directly contradicted the testimony Gellerman gave at trial.

■ A new trial should not be allowed based on newly discovered evidence unless the defendant "establishes that the evidence was: (i) unknown or unavailable at the time of trial, (ii) despite due diligence, (iii) material, and (iv) likely to result in an acquittal upon retrial." *United States v. Tibolt,* 72 F.3d 965, 971 (1st Cir.1995), *cert. denied,* 518

U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996).

The district court found that the evidence proffered in the Parenteau and Drew affidavits would have been available at trial but for a lack of due diligence. *DeLuca,* 945 F.Supp. at 413–14. Ouimette complains that he was unfairly surprised by Gellerman's perjurious description of the conversations in which Parenteau and Drew participated, and did not have enough time to locate these witnesses before the trial ended.

Quite the contrary, since Ouimette participated in these conversations he must have known long before trial that the "exculpatory" testimony these witnesses could provide would be essential to respond to the evidence against him, *whether or not Gellerman were to testify. See United States v. Slade,* 980 F.2d 27, 29–30 (1st Cir.1992) (noting that defendant's own conversations rarely qualify as "newly discovered" evidence).

Furthermore, one week after pleading guilty Gellerman testified to these very conversations, leaving Ouimette seven days to locate Parenteau and Drew. At no time did Ouimette request a continuance to enable a search for either Parenteau or Drew, or invoke compulsory process to secure their appearance. *See United States v. Levy–Cordero,* 67 F.3d 1002, 1018 (1st Cir.1995). As Ouimette failed to make the required four-part showing, *Tibolt,* 72 F.3d at 971, the district court did not abuse its discretion in denying a new trial, *id.* at 972.[21]

*Affirmed.*

---

19. Ouimette argues also that the "three strikes" provision contravenes the Eighth Amendment right to be free from cruel and unusual punishment. Rulings on the constitutionality of a statute are reviewed *de novo. United States v. DiSanto,* 86 F.3d 1238, 1244 (1st Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1109, 137 L.Ed.2d 310 (1997). Given Ouimette's lengthy history of violent criminal activity, the "three strikes" sentence cannot be considered grossly disproportionate. *See, e.g., United States v. Washington,* 109 F.3d 335, 338 (7th Cir.) ("The cruel and unusual punishments clause of the eighth amendment permits life imprisonment for a single drug crime, [so that] [l]ife for a repeat

bank robber whose record includes murder and attempted murder is an easy case.") (citing *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)), *cert. denied,* — U.S. ——, 118 S.Ct. 134, 139 L.Ed.2d 82 (1997).

20. We review only for manifest abuse of discretion. *United States v. Tibolt,* 72 F.3d 965, 972 (1st Cir.1995), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996).

21. Although appellants raise numerous other challenges to their convictions and sentences, none merits discussion.