UNITED STATES of America,
Plaintiff,

v.

Alexis CANDELARIO–SANTANA (01); Wilfredo Candelario–Santana (04); David Oquendo–Rivas (05), Defendants.

Criminal No. 09–427 (JAF).

United States District Court, D. Puerto Rico.

Dec. 18, 2012.

---

Julia Diaz–Rex, Marcela C. Mateo, United States Attorneys Office, San Juan, PR, Bruce R. Hegyi, United States Department of Justice Washington, DC, for Plaintiff.

Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, San Juan, PR, PHV David Arthur Ruhnke, Ruhnke & Barrett Law Office, Montclair, NJ Miguel Oppenheimer, Oppenheimer Rios & Assoc., Carolina, PR, Rafael Anglada–Lopez, Rafael Ánglada Lopez Law Office, Jose R. Aguayo, Jose R. Aguayo Law Office, San Juan, PR, for Defendants.

## MEMORANDUM ORDER

JOSE ANTONIO FUSTE, District Judge.

Before the court is a motion by the government requesting us to empanel an anonymous jury. (Docket No. 590.) Defendant Alexis Candelario–Santana[1] opposes.[2] (Docket Nos. 573; 639.) For the following reasons, the government's motion will be granted.

Because this is a capital case, there are two statutes that govern the question of whether to empanel an anonymous jury. The first is 28 U.S.C. § 1863(b)(7), which applies to anonymous juries in general—not just in capital cases. The other statute we must consider, 18 U.S.C. § 3432, applies to capital cases only. Most of the case law involving anonymous juries has occurred in the context of non-capital trials, but we will carefully point out where

[1]. Mr. Candelario–Santana's brother, Wilfredo Candelario–Santana, is a codefendant in this indictment. All references to "Candelario–Santana" are to Alexis Candelario–Santana unless otherwise noted.

[2]. In an earlier order, (Docket No. 540), we advised the parties that we would likely empanel an anonymous jury. Defendant Alexis Candelario–Santana then submitted a motion in opposition to an anonymous jury. (Docket No. 573.) After that, the government submitted a motion titled "Motion in Support of Anonymous Jury Panel and Heightened Jury Security." (Docket No. 590.) Defendants replied to that motion, opposing the empanelment of an anonymous jury. (Docket No. 573.)

the analysis changes because this is a capital case.

## A. General Principles

Under 28 U.S.C. § 1863(b)(7) a district court may empanel an anonymous jury "when the interests of justice so require." The First Circuit has held that an anonymous jury is "a permissible precaution where (1) there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." *United States v. Collazo–Aponte*, 216 F.3d 163, 181 (1st Cir.2000), *vacated on other grounds* (quoting *United States v. DeLuca*, 137 F.3d 24, 31 (1st Cir.1998)). There are several cases from this circuit, many of which originated in this district, approving of the use of anonymous juries under this statute. *See id.; DeLuca*, 137 F.3d at 31; *United States v. Marrero–Ortiz*, 160 F.3d 768, 776 (1st Cir. 1998); *United States v. Santiago–Lugo*, 167 F.3d 81 (1st Cir.1999).

This court has empaneled an anonymous jury in the trial of a "vast drug conspiracy," *affirmed* in *Santiago–Lugo*, 167 F.3d at 81, and in a trial of the Hells Angels, *United States v. Pasciuti*, 803 F.Supp. 499 (D.N.H.1992). Many of the same principles we applied in those two cases also apply here. The two criteria listed in *Collazo–Aponte* "are, or are nearly, universally applied to the question of whether or not to empanel an anonymous jury." *United States v. Honken*, 378 F.Supp.2d 880, 901 (N.D.Iowa 2004) (collecting cases).

When considering the first issue of jury protection, many courts have looked to the following five factors, initially propounded by the Eleventh Circuit: "(1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the 23 capacity to harm jurors; (3) the defendant's past attempts to interfere with the judicial process; (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir.1994). This five-factor inquiry has now been followed by the Fifth, Seventh, Eighth, Ninth, and District of Columbia Circuit Courts of Appeals. *See United States v. Shryock*, 342 F.3d 948, 971 (9th Cir.2003); *United States v. Edwards*, 303 F.3d 606, 613 (5th Cir.2002); *United States v. Mansoori*, 304 F.3d 635, 649 (7th Cir.2002); *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir.1995); *United States v. Edmond*, 52 F.3d 1080, 1091 (D.C.Cir.1995). Many of these courts have emphasized that these five factors are intended to provide guidance only and are not individually dispositive. *See Honken*, 378 F.Supp.2d at 905–06 (collecting cases).

## B. Evidence Needed

The next question, then, is what kind of evidence is necessary to support a finding of the need for an anonymous jury. The Fifth Circuit has held that "[a]lthough the district court must base its decision on more than mere allegations or inferences of potential risk, it may consider the indictment and affidavits submitted by the parties." *Edwards*, 303 F.3d at 613 (citing *United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir.1995)). In *Edmond*, the District of Columbia Circuit held that a district court did not abuse its discretion by empaneling an anonymous jury in the trial of a "large-scale criminal organization that distributed massive amounts of cocaine . . . and used violent acts to achieve its

goals." 52 F.3d at 1092. There, the D.C. Circuit held that the trial judge "reasonably could have ascertained a threat to jurors from the charges in the indictment." *Id.* The court also noted that the district court heard evidence *in camera* about the defendants' threats to witnesses, which indicated a "general willingness to obstruct justice." *Id.* at 1091–92. The court of appeals held that, given such findings, no evidentiary hearing was required on the issue of juror anonymity. *Id.* In *United States v. Wilson,* 160 F.3d 732, 747 (D.C.Cir.1998), the D.C. Circuit again upheld the district court's decision to empanel an anonymous jury, basing its finding on the indictment and an affidavit from the prosecutor.

Because this is a capital case, any finding of the need for an anonymous jury must also comply with 18 U.S.C. § 3432. That statute provides:

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial, excluding intermediate weekends and holidays, be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

Accordingly, in order to withhold juror information, in a capital case a district court must determine "by a preponderance of the evidence," that disclosure of the contested information "may jeopardize the life or safety of any person." *Id.*

In *Honken,* the district court noted that "[s]urprisingly few cases have interpreted this statute with regard to whether or not an anonymous jury was warranted in particular circumstances." 378 F.Supp.2d at 903. Still, the clear language of the statute, as well as the available case law, provide a reasonably identifiable path upon which to proceed.

The determination of whether to empanel an anonymous jury under § 3432 requires "an analysis into the dangerousness of the defendant and his willingness and/or ability to 27 interfere in the judicial process—an inquiry that is informed by the five-factor test expounded above." *United States v. Byers,* 603 F.Supp.2d 826, 830 (D.Md.2009). Courts in the D.C. Circuit have repeatedly applied the same standards to the § 3432 determination as they do in non-capital cases. *United States v. Edelin,* 128 F.Supp.2d 23, 43–44 (D.D.C. 2001) (applying five-factor test) (citing *Edmond,* 52 F.3d at 1091). In *Honken,* the district court took a similar approach, noting that the five-factor test "may be relevant" to the determination of whether to empanel an anonymous jury under 3432, *"but only to the extent that those factors go to the question of whether or not an anonymous jury is required 'to protect the life or safety of any person.'"* 378 F.Supp.2d at 905 (quoting § 3432) (emphasis in original).

■ Moreover, courts are not required to hold an evidentiary hearing before deciding to withhold juror information under § 3432. *See United States v. Dinkins,* 691 F.3d 358, 374 (4th Cir.2012) ("Neither Section 3432 any other statute requires that a district court conduct an evidentiary hearing before deciding to empanel an anonymous jury, provided that the court's decision is supported by compelling evidence of record.") (citing *United States v. Eufrasio,* 935 F.2d 553, 574 (3d Cir.1991)); *see also Byers,* 603 F.Supp.2d at 831 (relying on the charges in the case and four pretrial evidentiary hearings to make a find-

ing under § 3432); *Edelin,* 128 F.Supp.2d at 44 (finding it unnecessary to hold a hearing on the danger to the jury, relying instead on the indictment and government proffers). In fact, to our knowledge, "no court has held that such an evidentiary hearing is mandated under the statute." *Id.* (citing *United States v. Price,* No. 05–CR–492, 2008 WL 4682408, at *3–4, 2008 U.S. Dist. LEXIS 84441, at *10–11 (E.D.N.Y. Oct. 21, 2008)).

### C. *Defendant's Interests*

Finding a need for an anonymous jury is only the first of a court's two-part inquiry. *See Collazo–Aponte,* 216 F.3d at 181 (noting two-part test to determine whether anonymous jury is appropriate). We must also ensure that "reasonable safeguards" are taken to "minimize any risk of infringement upon the fundamental rights of the accused." *Id.*

█ A court should exercise caution before deciding to empanel an anonymous jury because of the potential prejudice to a defendant's rights. Empaneling an anonymous jury may potentially prejudice a defendant's rights in two ways. *Honken,* 378 F.Supp.2d at 905. First, if done improperly, without proper precautionary measures, an anonymous jury can interfere with a defendant's right to a presumption of innocence. *See id.* (collecting cases.) Second, an anonymous jury can interfere with a defendant's "right to trial by an impartial jury obtained through effective voir dire." *Id.* (collecting cases).[3] In particular, courts have emphasized the danger to defendant's right to exercise peremptory challenges. *Mansoori,* 304 F.3d at 670.

Because of these concerns, courts have cautioned that a decision to empanel an anonymous jury is an "extreme measure" that is only warranted in exceptional circumstances. *Id.* Other courts have called it a "last resort." *Edwards,* 303 F.3d at 613.

█ Therefore, in deciding whether to empanel an anonymous jury, a court must "balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.1994) (citations omitted). The Fifth and Seventh Circuits have also instructed district courts to balance the defendant's interests with the need to protect a jury. *See Mansoori,* 304 F.3d at 650; *Edwards,* 303 F.3d at 613.

### D. *Evidence and Findings*

Here, the court has been presented with ample information suggesting that an anonymous jury is necessary to protect the members of the jury and their factfinding function. *Collazo–Aponte,* 216 F.3d at 181. We review that information here.

First, we look to the third superseding indictment in this case.[4] (Docket No. 579.) On October 19, 2012, a grand jury returned a 52–count third superseding indictment. (*Id.*) The indictment charges defendants [1] Alexis Candelario–Santana, [2] Carmelo Rondón–Feliciano, and [4] Wilfredo Candelario–Santana as members of a criminal organization "whose members

---

3. By agreement, the government and counsel for Defendants have prepared a comprehensive written questionnaire that will be filled out by each prospective juror. The questionnaire proposed by the parties identifies the prospective jurors only by number. The per-

sonal identifiers are not requested in the questionnaire proposed.

4. All references herein to the indictment refer to this third superseding indictment.

engaged in narcotics distribution and acts of violence, including murder and attempted murder." (*Id.* at 1–2.) The overt acts in furtherance of this conspiracy include twenty-one (21) murders and twenty-one (21) attempted murders. (*Id.*; Docket No. 590·at 3.) Defendants [1] Alexis Candelario–Santana and [5] David Oquendo–Rivas are specifically charged with having committed violent crimes in aid of racketeering activity for nine (9) murders and twenty-one (21) attempted murders. (*Id.*)

As the government notes in its motion, defendants are charged as members of a long-standing "large criminal enterprise" that preserved and protected its power, territory, and profits through intimidation, violence, threats of violence, assault, murder, and attempted murder. (Docket Nos. 590 at 3; 579.) The indictment covers a sixteen-year period, from 1993 to 2009, and alleges forty-two (42) specific overt acts. (*Id.*)

Defendant [1] Alexis Candelario–Santana, in particular, has an exceptionally long and violent criminal record. (Docket No. 590 at 4.) According to the government, he has been adjudged guilty to twelve murders in Puerto Rico's commonwealth courts. (*Id.*) After serving only six years of a twelve-year sentence, Candelario–Santana was released from prison in February 2009. (*Id.*) He then is alleged to have orchestrated and participated in the Tómbola massacre in October 2009, less than six months after he was released from prison. (*Id.*) Defendant [2] Carmelo–Rondón–Feliciano has been serving a long sentence for drug trafficking since 2006, and [5] Oquendo–Rivas is serving a sentence for a firearm violation. (*Id.*)

This court also received information from pretrial services regarding Defendant Candelario–Santana's criminal background. We have seen reports of Defendant's history from the National Crime Intelligence Center (NCIC), as well as the original conviction records from Puerto Rico's commonwealth courts. In addition, a criminal history analysis, dated December 6, 2012, and provided by the Puerto Rico Police Department, confirmed that Defendant has been adjudged guilty of twelve murders. Defendant also has several more felony convictions on his record, including for weapons violations and destruction of evidence. The list of convictions and brushes with the criminal justice system is the longest and most impressive we have seen in twenty-seven years on the bench.

In addition to the indictment and the defendant's criminal records, this court has also considered other evidence submitted by the government and its witnesses. First, the 23 government submitted an affidavit, sworn under penalty of perjury, by an FBI Agent, Antonio Núñez–Fox ("Agent Núñez"). (Docket No. 606–1.) Agent Núñez is an FBI Task Force Agent assigned as one of the lead investigators for the "La Tómbola" Massacre. (*Id.*) His affidavit is based on his "personal investigation or through discussions with other law enforcement personnel or review of reports and documents." (*Id.*)

In his affidavit, Agent Núñez states that Alexis Candelario–Santana had been the owner of a drug-trafficking organization ("DTO") from 1993 to 2003. (*Id.*) In 2003, Candelario–Santana went to prison after being convicted of twelve murders. (*Id.*) Agent Núñez states that each of these people was murdered in order to protect the DTO or because they were viewed as threats to Candelario–Santana. (*Id.*) When he went to prison, Candelario–Santana allowed other members of his DTO—Rondón–Feliciano and Wilfredo Semprit–Santana—to operate the drug point, with the understanding that Candelario–Santana would continue to receive payment in

prison. (*Id.*) For some time, Candelario–Santana did receive payments, but later, the payments stopped. (*Id.*)

According to Agent Núñez, Wilfredo Semprit–Santana assumed unilateral control over the drug point when Rondón–Feliciano went to prison. (*Id.*) Unhappy that Semprit–Santana was not paying him profits from the drug point, Candelario–Santana then allegedly stated that he would kill Semprit–Santana when he was released from prison. (*Id.*) Six months after his release from prison in 2009, Candelario–Santana and other armed individuals allegedly approached La Tómbola on October 17, and began shooting. (*Id.*) Eight people and one unborn child died in the shooting, and twenty-one were injured. More than 326 exploded shell casings were recovered from the scene. (*Id.*)

According to Agent Núñez, in the initial investigation of the shooting by the Puerto Rico Police Department, many of the witnesses to the shooting were initially fearful and unwilling to provide statements to investigators. (*Id.*) Agent N úñez stated that witnesses were fearful to provide any information because they were afraid of Candelario–Santana. (*Id.*) The witnesses were familiar with the "large and violent organization" operated by Candelario–Santana, and noted that after being convicted of twelve murders, he had been released after serving only six years of a twelve-year sentence. (*Id.*) Because of the witnesses' unwillingness to speak with authorities, it was not until the FBI assumed jurisdiction of the investigation that authorities were able even to identify defendants [1] Candelario–Santana and [5] Oquendo–Rivas as some of the suspected shooters at La Tómbola. (*Id.*)

Agent Núñez goes on to state that at least four potential witnesses in this case have either been threatened, or expressed fear that they would be harmed, if they provided information linking Candelario–Santana to La Tómbola. (*Id.* at 3.) According to Núñez, one witness received a threat from Candelario–Santana's DTO that the witness would be killed if agreeing to speak with law enforcement; another witness received a threat from Candelario–Santana that the witness would be killed if agreeing to testify against Candelario–Santana. (*Id.*) This witness also heard reports that family members of witnesses would be killed if Candelario–Santana was convicted of any charges against him. (*Id.*) Two other witnesses were not directly threatened: One indicated that many other potential witnesses were afraid to mention Candelario–Santana's name because of their belief that the PRPD would not be able to protect witnesses. (*Id.*) A fourth witness stated having heard from a friend that Candelario–Santana indicated his plans to "finish killing everyone there." (*Id.*)

Agent Núñez's affidavit provides additional indications of the potential danger to jurors and witnesses at trial. (*Id.*) According to both witnesses' accounts and ballistic evidence from the scene at La Tómbola, there were more than two shooters present at La Tómbola. (*Id.*) Ballistics evidence indicates there were five different types of firearms used at La Tómbola. (*Id.*) Agent Núñez believes that there were additional shooters at La Tómbola acting in concert with Candelario–Santana who have not yet been charged.[5] (*Id.*) These shooters could still harm anyone who participates in the trial. The conclusion of Agent Núñez's affidavit states his belief

---

5. This claim was reinforced by two other witnesses the court heard. One of the witnesses was present at La Tómbola, and one was an FBI agent, Carlos Barreiro. The information that each provided is discussed below.

that "a clear and present danger exists that persons (and their families) identified as being associated with the prosecution" in this case will be "threatened, intimidated, assaulted, and/or killed." (*Id.*)

There are at least three other pieces of information this court has considered regarding the defendants' potential threats to witnesses and even jurors. We also held sealed, ex-parte hearings of testimony from another FBI Agent, Carlos Barreiro, and two potential witnesses, about the fears these individuals have if they testify against Candelario–Santana.[6] (Docket No. 699.) First, we heard testimony from Agent Barreiro. Agent Barreiro described his experience working with four of the individuals who provided information to government experts before trial. Agent Barreiro described the fears that each of these individuals has expressed in cooperating with the government.

One witness, who was injured in the shooting, needed to be picked up by Agent Barreiro far away from the witness' house, fearful for what might happen to the witness' family if it is discovered that the witness provided information against Candelario–Santana.[7] Another witness stated the belief that Candelario–Santana could harm said witness and others even from prison.

We then heard direct testimony from two of these individuals who had been interviewed by government psychological experts before trial. The fearful demeanor of the first witness was apparent as soon as the witness walked in the door. This witness was so fearful, in fact, that the witness hesitated to talk at all. When the witness did speak, the speech was in short, halting statements, making statements like, "I don't want to re-live that." The witness noted that Candelario–Santana had already killed people who were Candelario–Santana's own close acquaintances and family members. The witness worried, based on this past conduct, that revenge would fall on anyone who provided information against Candelario–Santana. The witness noted that Candelario–Santana still has many people on the outside, who could harm anyone that crossed him. This comment suggested that there are still shooters from La Tómbola who have not been indicted. The witness informed the court of at least one specific threat made to another witness.[8]

A second witness stated knowing Candelario–Santana would and could harm the witness if it were revealed that the witness was cooperating with the authorities. This witness described Candelario–Santana as "bad," and "very bold out there in the streets." The witness said Candelario–Santana was capable of doing La Tómbola and "much more." The witness stated that people working for Candelario–Santana have come to the area where the witness lives, near where La Tómbola took place, instructing people to tell the authorities that he (Candelario–Santana) wasn't around that night. The witness said that

---

**6.** We heard these witnesses in part to resolve a pre-trial motion filed by the defense. (Docket No. 680.) In another order, (Docket No. 701), we granted the government's request to keep confidential the identifying information of certain individuals who had provided information to government experts before trial. The court reporter has prepared a transcript of the hearings, which remains sealed.

**7.** We have intentionally avoided using any masculine or feminine pronouns or other gender identifiers because of concern for the witnesses' safety.

**8.** We independently reached the same conclusion as to other participants being at large during the Change–of–Plea Hearing of one of the co-defendants. This information became apparent during a bench conference held.

people in the area where the witness lives have been killed by Candelario–Santana. Again, the demeanor of this second witness helped convey the level of harm that Candelario–Santana has brought to the area of Sabana Seca, and the level of fear that still permeates there.

## E. *Findings*

■ After carefully reviewing the evidence presented to us, we hereby make the following findings. The criminal records of the defendants in this case, as well as the charges in the indictment, leave little doubt that there are "strong grounds for concluding that [an anonymous jury] is necessary to enable the jury to perform its factfinding function," as well as "to ensure juror protection." *Collazo–Aponte*, 216 F.3d at 181 (quoting *De Luca*, 137 F.3d at 31). Under these circumstances, we find there is a "sufficient foundation for empaneling an anonymous jury both as a prudent safety precaution and a means of ensuring unfettered performance of the factfinding function." *Id.* at 182 (quoting *De Luca*, 137 F.3d at 31).

An analysis of the five factors propounded in *Ross*, 33 F.3d at 1520, helps demonstrate why an anonymous jury is required in this case. Because the analysis required under § 3432 is closely related to the five-factor test here, we discuss the two inquiries together. *See Honken*, 378 F.Supp.2d at 906 (incorporating § 3432 analysis into each of the five factors).

Under the first prong, Defendant clearly has extensive "involvement in organized crime." *Ross*, 33 F.3d at 1520. As the government points out in its motion, (Docket No. 590), the defendants in this case are all alleged to be part of a "large criminal enterprise" that, over a sixteen-year period, committed dozens of acts of "intimidation, violence, threats of violence, assault and murder." (*Id.* at 3.) A detailed account of the overt crimes committed by this organized crime group can be found in the third superseding indictment, discussed above. (Docket No. 579.) Defendant's involvement in organized crime also makes it more likely that disclosing juror information may "jeopardize the life of any person" under § 3432, given that Defendant's organized crime group is alleged to have committed at least twenty-one murders already. Witnesses and jurors, among others, are at risk.

We next consider whether Defendant is a participant in "a group with the capacity to harm jurors." *Ross*, 33 F.3d at 1520. Again, we find that Defendant meets this criterion. The alleged past crimes committed by Defendant make clear the extent of damage he is capable of inflicting. Moreover, the two witnesses we heard *in camera* reinforced the widely held belief that Defendant remains able to harm people even while incarcerated. The sworn testimony of FBI Agents Barreiro and Núñez added further credence to this assessment of Defendant's capacities. Moreover, we heard both the authorities and witnesses to La Tómbola describe their belief that additional shooters that day remain at large. Both witnesses and agents expressed concern that these people could harm participants in the trial process. All of these factors convince us that disclosing juror information could "jeopardize the life" of the jurors under § 3432.

The third factor inquires into the "defendant's past attempts to interfere with the judicial process." *Ross*, 33 F.3d at 1520. Here, we take into account the testimony from Agent Barreiro and the two witnesses we heard, as well as the affidavit from Agent Núñez. The affidavit from Agent Núñez describes direct threats made to two potential witnesses, as well as indirect threats to two additional witnesses. Agent Barreiro also provided an

account of the near universal fear that witnesses and their families have when cooperating with the government. One of the witnesses we heard also suggested that Candelario–Santana had sent representatives to the area near La Tómbola, instructing people not to testify that he was there on the night of the shooting. We think this is more than enough evidence of Candelario–Santana's "past attempts to interfere with the judicial process." *Ross.* In *Edmond,* the D.C. Circuit affirmed a district court's decision to empanel an anonymous jury based on similar evidence. There, as here, the district court had been presented with "in camera submissions describing threats to witnesses." *Id.* The court of appeals rejected the defendant's suggestion that such information was inadequate to support a finding of juror tampering: "Numerous court cases illustrate that such information, indicating a general willingness to obstruct justice on the part of a defendant or his associates, is more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors." *Id.* (citations omitted). We agree, and find that, in light of Defendant's alleged willingness to kill anyone who harms his interests, there is enough evidence to support a finding of jury danger under § 3432.

Under the fourth prong, we consider "the potential that, if convicted the defendant will suffer a lengthy incarceration and substantial monetary penalties." *Ross,* 33 F.3d at 1520. We find that this factor again points in favor of empaneling an anonymous jury. If convicted, Candelario–Santana will potentially be sentenced to life imprisonment or the death penalty. There are no greater penalties the law can impose. These two punishments "surely provide a strong inducement to resort to extreme measures in any effort to influence the outcome of the trial." *De Luca,* 137 F.3d at 32 (citing *Ross,* 33 F.3d at 1520). We find that this "strong inducement" to influence the outcome of the case also makes it more likely that Defendant would seek to harm witnesses or jurors, supporting a finding of danger under § 3432.

Finally, the fifth factor discusses the "extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." *Id.* Here, this factor points decisively in favor of anonymity. Since the shootings at La Tómbola occurred in 2009, they have generated an enormous amount of publicity. Television, radio, and newspaper media outlets have dedicated hundreds of stories to covering not only the original events, but also the subsequent developments involving victims, suspects, and surrounding communities. A recent search by this court's research librarian, using the database "Noticias Online," returned several hundred results of media reports about the shootings.[9] Again, these media reports occurred within every medium of Puerto Rico's media offerings: Television, radio, and print form journalism. A separate search of the digital archives of one of Puerto Rico's leading newspapers, EL NUEVO DÍA, yielded fifty-three articles about the shootings.[10]

---

9. http://www.noticiasonline.com/searchresults.asp?cx=partner–pub 0041619537557690:utjqcd–635k&cof= FORID:9&ie=ISO–8859–1&q=masacre+tombola+puerto+rico&sa=Search&siteurl= http:%3 A%2 F%2 Fwww.noticiasonline.com%2 F (last visited Dec. 17, 2012).

10. http://www.adendi.com/search.asp?keyword=masacre+tombola&field=body&mon0=12&day0=11&year0=2012&mon1=12&year1=2012&dtrange=period&from=10%2 F18%2 F2009&to=12%2 F11%2 F2012 (last visited Dec. 17, 2012).

Therefore, we have every reason to believe that this criminal case, when it takes place, will receive a great amount of publicity. There is a very real danger that jurors would be harassed, intimidated and perhaps be harmed if their information is released. As the First Circuit has acknowledged, this type of publicity not only potentially threatens the jurors' own safety, but also can interfere with their role as neutral and objective factfinders. *Collazo–Aponte*, 216 F.3d at 181. If jurors are afraid that they will be harassed, intimidated or subjected to harm, they will be less likely to perform their factfinding role successfully and without inhibition. Therefore, we find it is crucial that their identifying information be kept confidential.

### F.  *Precautionary Measures*

The government's motion requests that the names, addresses, and places of employment of the prospective jurors not be revealed to the parties, the attorneys or the public. (Docket No. 590 at 1.) The government also requests that jurors be sequestered during lunch and recesses under the protection of the United States Marshals Service; that they be transported each trial day to and from an undisclosed central location; and that no unauthorized person be permitted to follow any such vehicle or juror to or from the designated locations. (*Id.*) These requests will be granted by the court; in a later order, we will lay out the exact steps to be taken to protect juror safety and anonymity.

As we have done in prior cases involving anonymous juries, we will "take adequate precautions to protect defendants' rights." *Collazo–Aponte*, 216 F.3d at 182. In past cases, we "did not mention any threat to juror safety, but, rather, informed the jurors that they would remain anonymous during the trial because of publicity concerns. [We also] instructed the jury on the presumption of innocence, and periodically repeated that instruction as the trial progressed." *Id.* (quoting *Marrero–Ortiz*, 160 F.3d at 776). We will do the same here.

In the trial of *United States v. Santiago–Lugo*, Cr. No. 95–029, (Docket No. 1884, Nov. 13, 1997), we issued an order in the case to empanel an anonymous jury. There, we found:

[T]he anonymity of the jury panel, as well as jury sequestration if need be, are alternatives that the court may utilize to reduce the risks of jury retaliation, tampering or intimidation. The potential for at least jury intimidation is high. The proclivity toward violent crime that is apparent from this record leads us to believe that tampering with the jury or at least jury intimidation is a possibility. When jurors are exposed to those risks, their legitimate fact-finding functions will definitely be distorted and jurors will be distracted from the quality of attention needed for a trier of fact to function properly. Jurors, contrary to judges or law enforcement officers, are not used to the pressures of intimidation techniques and it is only logical to assume that the effect on a juror is more severe than on a trial judge or a law enforcement officer who deals with these problems frequently.

Many of the same concerns are present in this case, leading us to believe in the need to empanel an anonymous jury. As we did in *Santiago–Lugo*, we intend to use Judge Pollack's instruction, adopted by the Honorable T. Emmet Clarie, Senior District Judge, U.S. District Court, District of Connecticut, on September 1, 1988, in the case of *U.S. v. Victor M. Gerena, et al.*, Cr. No. H–8550, involving the $7+ Million Wells Fargo, Hartford, Connecticut, rob-

bery. The cautionary instruction will read as follows:

This should be a very interesting case. Undoubtedly, it could receive considerable publicity from newspapers, radio, and television. The media and the public may be curious concerning the identity of the participants, the witnesses, the lawyers, and the members of the jury. That curiosity and its resultant comments may come to the attention of the jury selected here and possibly impair its impartiality by viewpoints expressed, comments made, opinions, inquiries, and so forth.

I am sure that you understand that such outside influences could tend to distort what goes on in the trial and, therefore, it is my duty to eliminate distractions and matters that may take away the attention of the selected jury. The court wishes to avoid people prying into the personal affairs of the participants, including those selected as jurors who, as you know, become the judges of the facts on the basis of evidence brought legally before the court.

Consequently, taking into consideration these circumstances, I have decided that in selecting those who will serve in the jury your name, your address, and your place of employment will remain anonymous during the trial of this case. That is the reason why you have been assigned a number. That number serves the purpose of your name and identifies you for all purposes with the court.

This will serve to ward off curiosity and seekers of information that might otherwise infringe on your privacy. It will also aid in insulating and sheltering you from unwanted and undesirable publicity and notoriety, and any access to you which could interfere with preserving your sworn duty to fairly, impartially, and independently serve as jurors. It will also permit the media complete freedom of coverage of this trial.

I emphasize that this measure is taken only to protect the right of privacy of the participants and to assist you in discharging your responsibility as jurors fairly and impartially.

I know that this raises some thoughts about how one manages to give jury service under these circumstances. I assure you that jury service in this case will be an interesting and pleasant[11] experience to those of you who are privileged to be selected. Jury duty is of the highest obligation of citizenship and you should be told, as I am now telling you, that the judges in this court and the parties appearing before it appreciate the importance of your fair and impartial consideration of this case.

See *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.1985).

Moreover, because this is a capital case, we are particularly mindful of the need to protect the defendants' rights. *See Honken,* 378 F.Supp.2d at 906 ("[I]n a death penalty case, the defendant's rights should be given at least as much protection as in any other case."); *Edelin,* 128 F.Supp.2d at 44–45 (listing precautions to protect defendant's rights, including using a questionnaire, *voir dire,* and providing a neutral explanation for juror anonymity). A stipulated detailed juror questionnaire will be utilized, and counsel will have the opportunity to conduct an effective *voir dire* and exercise their peremptory challenges with abundant information. We will also notify the jurors that we are taking these

---

**11.** We may strike the phrase "and pleasant" from the quoted jury instruction when we utilize the same in this case.

steps for publicity, not security reasons, and we will frequently remind the jury of the presumption of innocence.

### *Conclusion*

The government's motion, (Docket No. 590), is hereby **GRANTED.** We will empanel an anonymous jury. The agreed-upon schedule remains the same, with jury questionnaires to be filled out beginning on January 8, 2013, 916 F.Supp.2d 191, 2013 WL 101615.

**IT IS SO ORDERED.**